**PAK HEINZ PLLC**
Albert Pak (Bar No. 361123)
Albert.Pak@pakheinz.com
Noah Heinz (*pro hac vice forthcoming*)
Noah.Heinz@pakheinz.com
20 F St NW, 7th Fl
Washington, DC  20001
Tel.: (202) 505-6350

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUINT DUNAWAY, RABIA SHAHBAZZ, and VERA VALLEJO-DUNCAN, | Case No. _____ |
|     Plaintiffs, | **COMPLAINT** |
|     v. | |
| NETFLIX, INC., a Delaware corporation, | |
|     Defendant. | |

## INTRODUCTION

1.      This lawsuit challenges a proposed merger by which Netflix Inc. ("Netflix") would entrench its market dominance of and establish a monopoly in the United States market for Subscription Video on Demand ("SVOD") and visit anti-competitive harms like increased pricing and degraded service quality on Plaintiffs and other Netflix subscribers.

2.      By all available metrics, Netflix is the dominant firm in the United States market for on-demand streaming.  Its dominant position derived in part from its first-mover advantage—Netflix originated the SVOD market in 2007—and in part from business practices focused on keeping certain content exclusive to Netflix and depriving competitors of the right to distribute.

3.      Not satisfied with its already-dominant market position, Netflix now seeks to consummate an extraordinary acquisition of certain subsidiaries of Warner Bros. Discovery, Inc. ("WBD") that would further entrench its dominance and establish a monopoly in SVOD.  This proposed transaction would have horizontal and vertical market consolidating effects.

4.      Netflix seeks to acquire one of WBD's flagship assets:  HBO Max, a direct and highly significant competitor in SVOD.  As alleged herein, HBO Max is a unique and important SVOD competitor firm.  HBO Max is the most capable of all rival SVOD firms to challenge Netflix's market dominance and compete for SVOD customers on price and quality.  Netflix leadership has long acknowledged the importance of HBO Max's market position and the pro-competitive effects that flow from the Netflix/HBO Max rivalry.

5.      Allowing Netflix to acquire HBO Max will eliminate a direct competitor and result in the post-merger firm enjoying an SVOD market share above a threshold that triggers a presumption of illegality and anti-competitive effect under guidelines promulgated by the Department of Justice and the Federal Trade Commission.

6.      Netflix also seeks to acquire WBD's film and television studios and associated content and IP assets.  The WBD film and television subsidiaries house one of the deepest film and television libraries in the world.  The WBD library also plays a unique role in the SVOD marketplace because WBD has proven atypically open to licensing its vast back catalog for distribution on SVOD

competitor platforms.  As a result, the WBD library has emerged as a shared resource that SVOD competitor firms rely upon to obtain content for distribution on their SVOD platforms through third party licensing agreements.

7.     Netflix, in addition to being an SVOD service provider, has also emerged as an important force in the market for producing new television and film content.  Unlike a typical production partner, Netflix has consistently insisted on receiving permanent and exclusive rights over the original content it finances, which Netflix then declines to license for distribution through other means.  Instead, Netflix makes the content it produces available "Only on Netflix."  That long term strategic approach is contrary to how WBD has managed its vast library of film and television content.

8.     Allowing Netflix to acquire WBD's film and television studios and associated content would also have anti-competitive effects in the SVOD marketplaces.  Post-merger, Netflix would have the means and motivation to cease the licensing of WBD content to competitor SVOD firms in favor of making the WBD library available exclusively on platforms owned and controlled by Netflix.  Depriving SVOD competitor firms of this essential input would weaken them and exacerbate the market concentrating and anti-competitive effects of the HBO Max acquisition.

9.     The overall impact of Netflix's proposed acquisition would be to stifle competition in the SVOD marketplace and entrench Netflix's dominant position.  Once that occurs, Netflix will be free to increase the price and degrade the quality of its services, thus enriching itself at the expense of subscribers like Plaintiffs.

10.    Plaintiffs seek an injunction barring Netflix from consummating a transaction that would form a monopoly and substantially lessen competition in violation of the Clayton Act.

## PARTIES

### PLAINTIFFS

11.    Plaintiff Quint Dunaway is a resident of California.  Dunaway is a subscriber to Netflix and has been a subscriber since January 2021.  Dunaway has also subscribed to one or more SVOD competitor firms.

12.     Plaintiff Rabia Shahbaz is a resident of California.  Shahbaz is a subscriber to Netflix and has been a subscriber since March 2020.  Shahbaz has also subscribed to one or more SVOD competitor firms.

13.     Plaintiff Vera Vallejo-Duncan is a resident of California.   Vallejo-Duncan is a subscriber to Netflix and has been a subscriber since August 2017.   Vallejo-Duncan has also subscribed to one or more SVOD competitor firms.

**DEFENDANT**

14.     Defendant Netflix is a Delaware corporation, with its principal place of business in Los Gatos, California, within the Northern District of California.

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction over the federal antitrust claims under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

16.     This Court has personal jurisdiction over Netflix because Netflix has its principal place of business in California, does business in California, and has sufficient minimum contacts with California.

17.     Venue is proper in this district under 15 U.S.C. § 22 because Netflix transacts business in this district.  Venue is also proper in this district under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

**FACTUAL ALLEGATIONS**

**I.     NETFLIX CREATES AND DOMINATES THE SVOD MARKET**

**A.     Netflix Establishes Its Lead Over the DVD Rental Market**

18.     Founded by Reed Hastings and Marc Randolph in 1997, Netflix began as an online DVD rental and distribution firm.[1]  Hastings and Randolph sought to emulate Amazon's internet-facilitated business model and apply it to DVD delivery.[2]   Netflix capitalized on burgeoning

---

[1] Brian Barrett et al., *Netflix is Turning 20—But Its Birthday Doesn't Matter,* WIRED (Aug. 29, 2017) https://www.wired.com/story/netflix-20th-anniversary/ [https://perma.cc/E9MX-5RVQ].

[2] Jack Lubin, *Stream a Little Dream: How Netflix Turned Our Culture Into Content*, Systemic Just. J. 8–10 (July 2021), https://systemicjustice.org/article/stream-a-little-dream-how-netflix-turned-our-culture-into-content/ [https://perma.cc/D3TG-PE38].

Complaint—Case No. _____

technologies to gain an early lead and establish market dominance—the same approach it would later apply to acquire dominance in the emergent SVOD market. NetFlix.com launched in April 1998 and, initially, offered DVDs on a per-rental pricing model.

19. Before Netflix was a year old, it had an acquisition offer: Amazon's Jeff Bezos had made an offer to acquire Netflix for "somewhere in the low eight figures."[3] Amazon had made a number of acquisitions that year, intending to expand beyond book sales. But Netflix said no.

20. In 1999, Netflix shifted to a subscription model that offered users unlimited rentals per month for a set fee.[4] When a user was finished with a DVD, they returned it using a prepaid envelope. Netflix would then mail them the next DVD from a user-managed queue controlled via Netflix's website.

21. Between 2000 and 2007, Netflix's business grew to 6.3 million subscribers and achieved national market penetration.

22. Netflix developed several assets that helped gain market dominance. Netflix first amassed a large cache of user data—including names, addresses, contact information, and rental history—through its DVD delivery business. Netflix then leveraged this data by developing a proprietary algorithm recommendation system called Cinematch.[5] Cinematch analyzed rental history data and user ratings, then offered recommendations based on what users with similar rental histories and user ratings had also enjoyed. It worked: "[s]eventy percent" of rentals were recommendations, per *Wired*. The more users rented, the more data Cinematch had to analyze, increasing the breadth and precision of its predictions.

23. Netflix's James Bennett and Stan Lanning explained Cinematch as insurance against "churn," or user attrition: "If subscribers fail to find movies that interest and engage them, they tend

---

[3] *See* Ashton Jackson & Jade Scipioni, *Jeff Bezos and Amazon Once Tried To Buy Netflix, Co-Founder Says: 'We Said No, and Worked Our A-- Off for 20 Years'*, CNBC (Apr. 17, 2025) https://www.cnbc.com/2025/04/17/netflix-co-founder-why-we-turned-down-jeff-bezos-early-acquisition-offer.html [https://perma.cc/HD9G-X9TX].

[4] Jeffrey M. O'Brien, *The Netflix Effect*, WIRED (Dec. 1, 2002), https://www.wired.com/2002/12/netflix-6/ [https://perma.cc/NF4M-CUNL].

[5] *Id.* ("Netflix doesn't just deliver DVDs, it tells subscribers which ones they'll probably like, thanks to the Netflix recommendation engine — a combination of 29,000 unique lines of code and a database of 180 million film ratings known as CineMatch.").

4

to abandon the service. Connecting subscribers to movies that they will love is therefore critical to both the subscribers and the company."[6]

24. With a head start and a proprietary recommendation algorithm, Netflix hit 6.8 million subscribers by mid-2007.[7] Blockbuster, who had launched its own DVD delivery service to compete, had only about 3 million. But competitors' numbers were growing, and Netflix held only 12% of the total DVD rental market.

**B. Netflix Leverages First-Mover Advantage to Establish Dominant Market Position in SVOD.**

25. As early as 1999, Netflix leadership characterized its DVD business as a means "to scale the customer base for what we ultimately want to do, which is streaming."[8] By 2007, advances in computer networking infrastructure had made streaming possible at scale.

26. Netflix's video-on-demand experiment was initially called "Watch Now." Studios and license holders were happy to allow Netflix to pay for "older films that studios were likely pleased to get into the public eye in any way possible."[9] Digital distribution was novel, so studios had no reason to view it as a competitive threat. Netflix leadership, while acknowledging that the "mainstream consumer adoption of online movie-watching will take a number of years due to content and technology hurdles," set about gaining a market advantage during this interim period by expanding its film selection and working "to get to every Internet-connected screen, from cell phones to PCs to plasma screen [televisions]" onto its service.[10]

---

[6] James Bennet & Stan Lanning, *The Netflix Prize* (2007), https://www.cs.uic.edu/~liub/KDD-cup-2007/proceedings/The-Netflix-Prize-Bennett.pdf [https://perma.cc/29FX-BEU4].
[7] *Netflix Lowers Its Online DVD Rental Fees*, NBC News (July 22, 2007), https://www.nbcnews.com/id/wbna19902836 [https://perma.cc/7QZK-UU2N].
[8] Will Tavlin, *Casual Viewing—Why Netflix Looks Like That*, n+1, Winter 2025, https://www.nplusonemag.com/issue-49/essays/casual-viewing/ [https://perma.cc/7E9T-58VY].
[9] Quentin Hardy, *Netflix to Stream Live Movies For Free*, Forbes (Jan. 16, 2007), https://www.forbes.com/2007/01/15/netflix-free-video-streaming-tech-media-cz_qh_0116netflix.html [https://perma.cc/4CKA-8BJ4].
[10] Paul Bond, *Netflix Rolls Out VOD Rental Plan*, Hollywood Reporter (Jan. 16, 2007), https://www.hollywoodreporter.com/business/business-news/netflix-rolls-vod-rental-plan-128004/ [https://perma.cc/B9MS-PNM6].

27.     Netflix prioritized licensing from third-party content producers for its streaming debut.  Netflix initially offered about one thousand titles, licensed from a huge range of major media studios, including Warner Bros., Paramount, NBC, Sony, MGM, and 20th Century.[11]

28.     Netflix's first-mover status provided a meaningful advantage in licensing.  There was minimal competition over these rights because streaming rights were not included in existing licensing agreements with cable providers, DVD distributors, or other traditional means of distributing content.  Studios viewed the nascent SVOD model as a low-risk source of new revenue, not a disruptive force or a competitive threat to existing revenue.

29.     The same assets that aided Netflix in gaining market share in DVD rentals—large existing customer bases, deep well of user data, and its proprietary recommendation algorithm— allowed Netflix to obtain an early lead in the SVOD marketplace.  This alignment was, according to Netflix's founders, their plan from the "outset."

30.     Users took to the SVOD model from the beginning.  Netflix lauded SVOD's contribution to "faster subscriber growth, lower subscriber acquisition costs, and higher profit" margins to shareholders.[12]  Users liked the simplicity and ease of on-demand streaming.[13]

31.     By 2010, Netflix began offering streaming-only plans separate from its DVD delivery platform.  Netflix also expanded its streaming catalog, publicizing in 2008 an offering of "more than 12,000" movies and TV shows, eight times the number of streaming titles it offered at launch.[14] Netflix grew its catalog further through a renewed deal with Starz, which provided Netflix with access to Disney and Sony titles as well.

---

[11] Nate Anderson, *Netflix Offers Streaming Movies to Subscribers*, ArsTechnica (Jan. 16, 2007) https://arstechnica.com/uncategorized/2007/01/8627/ [https://perma.cc/KF8C-TWA7]; Gina Keating, *Netflix Launches 1,000-Title Online Movie Feature*, Reuters (Aug. 9, 2007), https://www.reuters.com/article/lifestyle/netflix-launches-1000-title-online-movie-feature-idUSN11457284/ [https://perma.cc/DQD6-RFG9].

[12] *Netflix 2008 Annual Report*, https://s22.q4cdn.com/959853165/files/doc_financials/annual_reports/Final_AR_10K.pdf [https://perma.cc/X3FT-FPPV].

[13] *See* Soo Youn, *Why People Hated Netflix When Streaming Launched*, Thrillist (June 29, 2007), https://www.thrillist.com/entertainment/nation/netflix-history-streaming-in-2007 [https://perma.cc/S9DB-TYGY] (describing, in spite of the title, some positive to mixed reviews of Netflix's early SVOD platform).

[14] *Netflix 2008 Annual Report*, *supra* note 12.

Complaint—Case No. _____

32.     By 2011, streaming had grown so rapidly that Netflix made SVOD its primary strategic focus.[15]  Users had spoken with their wallets: they wanted video-on-demand.  Netflix, with a powerful, proprietary algorithm driven by user data, a critical mass of existing users with buy-in, and a big head start on licensing content from media studios, was positioned to deliver what users wanted.

**C.     Netflix Begins Original Programming But Declines To License or Distribute to Competitors.**

33.     Netflix recognized that it was "completely dependent on the studio or other content distributor to license . . . content [to Netflix] in order to access and stream content."[16]  These "increasingly long-term" agreements were a perennial source of risk.  Distributors could change their terms, raise licensing costs, or lose their willingness to work with Netflix altogether.  If distributors wanted, they could cut Netflix off completely, depriving it of the licensed content it needed to maintain its subscribers.

34.     Netflix hedged against that risk by entering the original content business.  Its access to user data, including up-to-date information about viewing habits and content preferences, was an asset for this venture.

35.     Netflix's foray into original programming began with its successful bid to remake a BBC political drama, *House of Cards*, in 2011.  Netflix did not originate this project.  Instead, Netflix won the rights only *after* an extensive bidding war against established networks, including HBO.[17]  The agreement obliged Netflix to produce two full seasons of *House of Cards* without a traditional

---

[15] *See* Greg Sandoval, *Netflix's Lost Year: The Inside Story of the Price-Hike Train Wreck*, CNet (July 11, 2012) https://www.cnet.com/tech/services-and-software/netflixs-lost-year-the-inside-story-of-the-price-hike-train-wreck/ [https://perma.cc/A9AV-U3S7] (outlining Netflix's efforts to decenter DVD delivery and prioritize streaming).

[16] Netflix, Inc., Form 10-K (2011), https://s22.q4cdn.com/959853165/files/doc_financials/annual_reports/NFLX_10K.pdf [https://perma.cc/EU3G-5QYD].

[17] Nellie Andreeva, *Netflix To Enter Original Programming with Mega Deal for David Fincher-Kevin Spacey Series "House of Cards"*, Deadline (Mar. 15, 2011), https://deadline.com/2011/03/netflix-to-enter-original-programming-with-mega-deal-for-david-fincher-kevin-spacey-drama-series-house-of-cards-114184/ [https://perma.cc/MY6C-8DB3].

pilot. This unusually pro-producer agreement—labeled a "mega-deal" by media observers—allowed Netflix to compete with existing studios and enter a crowded market.

36. Netflix released *House of Cards* in February 2013. Notably, Netflix released the entire season at once. Netflix justified this unusual move by citing customers' love of "binge watching" entire seasons—an observation made possible by the data Netflix had collected on viewer habits and preferences.[18]

37. After *House of Cards*, Netflix rapidly expanded into producing a wide variety of original content. Netflix released its first animated series, a spinoff of the movie *Turbo*. It entered a four-series deal with Marvel. It licensed its first reboot of an existing property with *Arrested Development*. It embarked on a multi-film deal with Adam Sandler, its first such arrangement.

38. Netflix took an unusual approach to its original content production by refusing to re-license it for distribution through other channels, cable and SVOD alike. Instead, Netflix structured its production deals to retain exclusive distribution rights.

39. Traditionally, original programming is produced through development and production deals between networks and production teams. Networks agree to fund around 60 to 70 percent of production costs in exchange for the right to distribute the first run of the show.[19] For promising TV show scripts, networks will first order a "pilot," which the network and production companies may work together to cast and create.[20]

40. Production companies typically retain the right to profit from licensing, merchandise sales, and syndication agreements, providing them with leverage to renegotiate if the show is a

---

[18] Mark Lawson, *Netflix's House of Cards Invites TV Viewers To Binge – But Are We Ready?*, Guardian (Feb. 6, 2013), https://www.theguardian.com/tv-and-radio/tvandradioblog/2013/feb/06/netflix-house-of-cards-binge [https://perma.cc/A6C6-7LWP].

[19] Cyntha Littleton, *Netflix Chief Doubles Down on Streamer's Dealmaking Terms and Limited Theatrical Release Strategy*, Variety (Oct. 17, 2024), https://variety.com/2024/tv/news/netflix-ted-sarandos-double-down-cost-plus-1236181662/ [https://perma.cc/W6PY-XYUS].

[20] Elizabeth Kolbert, *Finding the Absolutely Perfect Actor: The High-Stress Business of Casting*, N.Y. Times (Apr. 6, 1994), https://www.nytimes.com/1994/04/06/arts/finding-the-absolutely-perfect-actor-the-high-stress-business-of-casting.html?sec=&spon=&pagewanted=all [https://perma.cc/E9KK-7HTS] (describing Warner Bros. Television executives' roles in casting and originating what eventually became one of the most beloved TV shows of all time, *Friends*).

success.  Production companies can then seek greater funding for production or higher pay for actors and crew.  Particularly successful shows can even be licensed to run on multiple networks at once.  If the network's offer is unsatisfactory, the production company can even threaten to leave the network altogether, though this can depend on the underlying contract.  Movie deals work similarly, with production companies and networks negotiating over scripts instead of pilots.

41.    Netflix's model is different.  Netflix instead offers "cost-plus" up front, meaning it agrees to pay for all production costs, plus a premium of around 30 percent.[21]  In exchange, Netflix deducts the costs of distributing the show from that premium, shifts the costs of residuals and crew fees to the production company, and retains permanent control over licensing rights that would ordinarily provide the production company with long-term revenue.  Netflix's contracts do not include requests for pilot episodes.  Netflix Originals are therefore negotiated, and the resulting contracts finalized and signed, before any filming or production has occurred.

42.    By retaining exclusive distribution and licensing rights, Netflix ensures that it can stream its originally produced content on Netflix and deprive SVOD competitors from distributing it.  Netflix promotes this aspect of its business to subscribers by incorporating the phrase "Only on Netflix" into its branding.

---

[21] Michelle Castillo, *Netflix Tries a Different Model for TV Shows, Paying More Up Front But Keeping More Later on Big Hits, Insiders Say*, CNBC (Aug. 15, 2018) https://www.cnbc.com/2018/08/15/netflix-cost-plus-model-tv-shows-revenue-upside.html [https://perma.cc/FAG5-GYE7].

Screenshot from trailer of Netflix's launch announcement for "the supernatural drama *Stranger Things*. Only on Netflix 15 July."[22]

43.     A Hollywood Reporter piece entitled "The Netflix Backlash: Why Hollywood Fears a Content Monopoly" described prevalent industry concerns about Netflix's insistence on exclusive licensing and distribution:[23]

> Studios and cable channels fret that the company, with its 83 million global subscribers, is sucking up so many eyeballs and bidding up prices for programming so high that they won't be able to compete.  And agents worry that as Netflix elbows out competing buyers, the company's growing insistence on buying up all rights to its original programming around the world will do away with the profit participations that on breakout shows (such as *Modern Family*) provide steady income in an unsteady industry.

---

[22] Netflix, Stranger Things, Facebook (June 10, 2016), https://www.facebook.com/NetflixUK/videos/weve-all-got-a-secret-hiding-in-the-shadows-winona-ryder-stars-in-the-supernatur/803767883058604/ [https://perma.cc/CH7U-NFX8].

[23] Kim Masters, *The Netflix Backlash: Why Hollywood Fears a Content Monopoly*, Hollywood Reporter (Sept. 14, 2016), http://www.hollywoodreporter.com/features/netflix-backlash-why-hollywood-fears-928428 [https://perma.cc/YU5L-AZMH].

Complaint—Case No. _____

44.    While content producers enjoyed the financial certainty provided by Netflix's cost-plus model, they feared the anticompetitive effects associated with the long-term control Netflix maintained over projects it financed and its hold over the "storytelling."[24]

45.    As time went on, competitors entered the SVOD market and began to compete to license content from studios.  But Netflix, thanks to its exclusive licensing agreements, was able to hold onto a reserve of shows and movies no other SVOD firm could bid on—Netflix Originals.

46.    At first, Netflix revenues depended only on monthly user fees, even as production costs soared, reassuring users that Netflix remained committed to an ad-free experience.  In 2015, CEO Reed Hastings stated his view unequivocally: "No advertising coming onto Netflix.  Period."[25] Netflix initially held firm on this view, even as other firms in the SVOD Market relied on ad revenue. As Variety's Todd Spangler wrote in 2015, "the company's execs, it seems, are smart enough to know that inserting commercials into the mix would be an epic fail."[26]

47.    Netflix recognized that inserting ads would degrade the quality of the service for users.

48.    However, as Netflix's place at the top of the SVOD Market grew more secure, it incrementally raised monthly fees and adjusted available plans to be more favorable to its interests.[27]

---

[24] *Netflix's Aggressive Content-Buying Spree Creates Opportunities and Risk for Creators*, Digiday (Apr. 2, 2018).  https://digiday.com/future-of-tv/netflix-content-spree-creators/ [https://perma.cc/8Y59-FFZD] (in contracting with Netflix, "TV studios and other content sellers give away the ability to make additional revenue down the road through licensing and syndication, as Netflix increasingly wants total ownership over its original series or onerous, long-term licensing exclusivities," and producers must "accept that their programming will compete for attention in an extensive library of original and licensed programming"); John Hazleton, *How Netflix, Amazon and Hulu Are Transforming the TV Business*, https://www.screendaily.com/features/how-netflix-amazon-and-hulu-are-transforming-the-tv-business-/5116347.article [https://perma.cc/AKF3-PDFY] ("There are even fears in some quarters of the US industry that the clout wielded by the SVoDs—and Netflix in particular—could soon reach a dangerous level. . . .  [I]t would be bad for storytellers in general if one company was able to seize a 40/50/60% share in storytelling.").

[25] Todd Spangler, *Why Netflix Adoption of Video Advertising Would Be a Total Disaster*, Variety (June 8, 2015),   https://variety.com/2015/digital/news/netflix-video-advertising-1201513201/ [https://perma.cc/4Z24-LPMM].

[26] *Id.*

[27] *See* Alex Munkachy, *The Complete History of Netflix Price Hikes—From 2007 to Now*, flixed (Dec. 15, 2023), https://flixed.io/netflix-price-hikes [https://perma.cc/SJW7-BAWT] (listing Netflix price and service changes by date).

In 2013, Netflix divided its subscriptions into three tiers: Basic, its lowest-quality option, Standard, then Premium, which allowed multiple households and higher-quality streaming for $4 more.  Prices for each tier have risen consistently:[28]

## Netflix Pricing History (US)

| Year | Basic | Standard with Ads | Standard | Premium |
|------|-------|-------------------|----------|---------|
| 2011 | $7.99 | – | – | – |
| 2013 | $7.99 | – | $9.99 | $11.99 |
| 2014 | $7.99 | – | $10.99 | $13.99 |
| 2015 | $7.99 | – | $11.99 | $14.99 |
| 2017 | $7.99 | – | $12.99 | $15.99 |
| 2019 | $8.99 | – | $13.99 | $16.99 |
| 2020 | $8.99 | – | $14.99 | $18.99 |
| 2022 | $9.99 | – | $15.49 | $19.99 |
| 2023 | *Phased Out* | $6.99 | $15.49 | $19.99 |
| 2024 | – | $6.99 | $15.49 | $22.99 |
| 2025 | – | $7.99 | $17.99 | $24.99 |

49.    As noted above, starting in late 2022, Netflix also walked back its promise of no advertisements and added a new tier, now known as Standard with Ads, then phased out the Basic tier.  Introducing advertising degraded the quality and user experience of the Netflix service.

50.    Netflix degraded the quality of its service in another way: making password sharing more restrictive.  In 2023, Netflix announced and implemented steps to limit password sharing among users and began charging a $7.99 monthly fee to share an account with someone outside of

---

[28]    Troy    Reeder,    *Netflix    Pricing    History*,    9Meters    (Jan.    22,    2025), https://9meters.com/entertainment/streaming/netflix-pricing-history    [https://perma.cc/2SCV-QU4T].

the subscriber's household.[29]  This was a reversal of a previous practice of turning "a blind eye to password sharing because it was fueling growth."[30]  Subscriber growth, not attrition, followed this anti-consumer change in policy.[31]

51.     When Netflix first launched its "streaming-only" package in 2011, subscribers paid $8 a month for unlimited streaming at the highest available quality.  In 2025, a subscriber seeking the same would owe Netflix $24.99 a month—an increase of over two hundred dollars over one year.  Netflix anticipates future price increases and product quality degradations.  Netflix's Q4 earnings report for 2025 warned of yet another "increase[] in membership and pricing" in 2026, despite reporting a 250% increase in ad revenue over 2024 and anticipating record-breaking profits for the year to come.[32]

52.     Netflix's market dominance has allowed it to increase pricing and degrade quality with minimal risk that users would cancel their subscription and replace it with a subscription from a competitor SVOD firm.

**D.     The SVOD Market Grows Beyond Netflix**

53.     Netflix's status as the sole competitor in the SVOD Market lasted less than a year. Hulu launched its streaming service in early 2008, featuring content made available through its partnerships with NBC and other media distributors.  Dozens of competitors soon followed.

54.     Each new entrant faced steep barriers to entry, chief among them CARDS: Content Acquisition, Research & Development, and Subscribers, or CARDS.  SVOD firms need a constantly updating library of desirable movies and shows to entice and maintain subscribers.  They need technological infrastructure able to support thousands of subscribers simultaneously streaming high-

---

[29] Jordan Valinsky, *Netflix Begins Password Sharing Crackdown in the US*, CNN (May 24, 2023), https://www.cnn.com/2023/05/23/business/netflix-password-sharing/index.html [https://perma.cc/6YUC-FYSZ].

[30] *Id.*

[31] Samantha Delouya, *Netflix Cracked Down on Password Sharing.  The Result? Millions of New Subscribers*, CNN (April 19, 2024), https://www.cnn.com/2024/04/18/business/netflix-earnings-first-quarter [https://perma.cc/42HZ-Z2P6].

[32] Kayla Cobb, *Netflix Teases Price Increase in 2026, Predicts Ad Revenue Will Double*, Wrap (Jan. 20, 2026) https://www.thewrap.com/industry-news/business/netflix-pricing-increase-2026-ad-doubling/ [https://perma.cc/G5SC-JY7P].

Complaint—Case No. _____

fidelity video over the internet.  And they need the subscribers themselves, whose subscriptions provide funds to license or create content and whose viewing habits provide guidance on which content to target.

55.    Although the SVOD Market grew beyond Netflix, Netflix never lost its dominant position.  Fierce competition between Netflix and other SVOD firms has produced stronger economic growth and better outcomes for consumers.  Beginning with Hulu in 2008, numerous competitors entered the SVOD Market.  Each followed the Netflix model of maintaining a rotating library of on-demand movies and shows, with recommendations powered by user data run through a proprietary algorithm.

56.    However, lacking Netflix's first-mover advantages, new entrants needed ways to catch up to Netflix.

57.    Hulu—the first major competitor to Netflix in the SVOD market— was the product of a deal between NBC and News Corp. and launched with extensive media partnerships and advertiser relationships.[33]  This provided Hulu with an "extensive programming lineup" of popular shows and movies.  Even with this considerable library *and* partnerships with Hollywood studios, Hulu never caught up with Netflix.

58.    Amazon's Prime Video made up for its lack of early partnerships by building off its existing user base of Amazon Prime subscribers.  Amazon Prime is a suite of services that includes, most prominently, accelerated shipping at no additional or discounted cost.  Like Netflix, Prime Video began as a free SVOD addition to a popular, existing subscription service.  While it is possible to subscribe to Prime Video separately from Amazon Prime, *all* Amazon Prime subscriptions come bundled with a Prime Video subscription.  Accordingly, consumer desire for Amazon Prime's suite of consumer benefits, including same- and next-day shipping, has been the primary driver of Prime

---

[33] *NBC Universal and News Corp. Announce Deal with Internet Leaders AOL, MSN, MySpace And Yahoo! To Create a Premium Online Video Site with Unprecedented Reach,* Futon Critic (Mar. 22, 2007),    http://www.thefutoncritic.com/news/2007/03/22/nbc-universal-and-news-corp-announce-deal-with-internet-leaders-aol-msn-myspace-and-yahoo-to-create-a-premium-online-video-site-with-unprecedented-reach--23951/20070322nbc01/ [https://perma.cc/E25R-DEFU].

Complaint—Case No. _____

Video subscriptions, not Prime Video itself.  As a result, Prime Video's market share is likely overstated.

59.    Prime Video's bundling arrangement allowed it to rapidly acquire a large user base. And Amazon already had *years'* worth of user data to use in developing a recommendation algorithm.  Despite these built-in advantages, Prime Video has not surpassed Netflix in subscriber count.

60.    A panoply of other competitors have launched SVOD services.  Disney+ and Paramount+ launched with catalogs licensed from their parent companies.  Free SVOD services like Tubi and PlutoTV showed advertisements instead of charging fees.  NBC, despite a partnership with Hulu, started its own service, Peacock.

61.    Some SVOD entrants caught on.  Others, like Seeso and Quibi, failed to find niches and quickly disappeared.  But none caught up to Netflix.

62.    Netflix has remained at the top of the SVOD market, leading in the number of subscribers and viewership, even as some of the largest firms in legacy media and retail have poured billions into their own SVOD ventures.  Netflix's first-mover advantage provided a crucial head start in infrastructure investment, original content development, and algorithmic precision.  Competitors, at least for now, have yet to make up that advantage.

**E.    HBO Launches HBO Max**

63.    HBO Max—the flagship streaming service of Home Box Office, Inc., a WBD subsidiary—is a uniquely important competitor in the SVOD Market that is more capable of challenging Netflix's current dominance than any other SVOD firm.

64.    HBO was founded in the 1970s as the first subscription-based premium TV service. By the 2000's, it had grown into a television behemoth and earned a reputation for high-quality programming, particularly its peerless library of "prestige" television shows, like *The Wire* and *The Sopranos*.

65.    After several false starts in SVOD, HBO launched HBO Max in 2020.  HBO Max gained a competitive advantage by supplementing its existing library of content with selections of

content Warner Bros., which owned "one of the most robust collections of premium streaming content that will appeal to all demographics in the household," and by partnering with dozens of first- and third-party content providers.[34]  By pulling "from WarnerMedia's deep library of fan favorites in its 100-year content collection" to offer a diversified catalog of original programming and licensed content, an exponential increase in options compared to HBO's early attempted entrants into SVOD, HBO Max was able to compete directly with Netflix and other market-leading, general-audience SVOD firms.[35]

66.    Discovery, Inc.'s merger with WarnerMedia provided a second opportunity for expansion.  The merger brought a tremendous number of reality television and lifestyle-oriented shows under the HBO Max umbrella, further diversifying options for subscribers.  With this merger, WBD became one of the largest media conglomerates in history, with HBO Max as its premier SVOD service.

67.    Of SVOD firms, HBO Max applies the most market pressure on Netflix.  Netflix leadership shares this view and has described HBO MAX as the "gold standard that we chase" in SVOD.[36]  HBO Max targets a general audience with its diverse catalog, just like Netflix.  HBO Max, like Netflix, is its own service and is not tied up in a "bundle of benefits," like Prime Video.[37]  Compared to other SVOD firms, HBO Max and Netflix are the most aligned: Disney+ targets families rather than a generalized audience, AppleTV+ lacks the scale to meaningfully compete, Peacock's library includes only NBC content, and Hulu emphasizes next-day streaming for reality and network television shows on cable over its own library.

---

[34] WarnerMedia, *WarnerBros Unveils HBO Max*, Warner Bros. Discovery (Oct. 29, 2019), https://press.wbd.com/us/media-release/hbo-max/warnermedia-unveils-hbo-max [https://perma.cc/8T5Z-L5VT].

[35] *Id.*

[36] *Netflix, Inc. NasdaqGS:NFLX FQ2 2019 Earnings Call Transcripts*, S&P Global Market Intelligence (July 17, 2019), https://s22.q4cdn.com/959853165/files/doc_financials/quarterly_reports/2019/q2/Netflix-Inc.-Q2-2019-Earnings-Call-Jul-17-2019-(1).pdf [https://perma.cc/E3JJ-N22Q].

[37] Digital Markets Act 2022/1925, art. 3, 2023 (EC), https://ec.europa.eu/competition/digital_markets_act/cases/202346/DMA_100016_104.pdf [https://perma.cc/AU4X-U86Z].

Complaint—Case No. _____

68.    Netflix leadership have described the rivalry between Netflix and HBO Max as pro-consumer.  A "Long Term View" report produced by Netflix leadership laid out the firm's view: "It wouldn't be surprising to us if HBO does their best work and achieves their highest growth over the next decade, spurred on by the Netflix competition and the Internet TV opportunity."[38]  The billions both firms have spent on content development and licensing substantiates this view.

F.    **Netflix Entrenches its Market Dominance**

69.    Netflix looms large over the SVOD Market according to several distinct forms of market analysis.  Under any reasonable market estimate, Netflix holds a dominant market position.  And, under any reasonable market estimate, a combination of Netflix and HBO Max would be positioned to overwhelm the relevant market and discipline competitors freely.

70.    According to Nielsen's "The Gauge," which tracks "TV viewing trends in the U.S.," Netflix accounts for about 38.1% of the SVOD Market.[39]  A post-merger, combined Netflix-HBO-Max would account for nearly half of the SVOD Market at about 44%:

| SVOD firm | Share (%) |
|---|---|
| Netflix | 38.1% |
| Disney/Hulu | 19.9% |
| Prime Video | 18.2% |
| Paramount | 10.6% |
| Peacock | 7.2% |
| HBO Max | 5.9% |

---

[38] Netflix, Long Term View (last updated Apr. 25, 2013) (footnote omitted) (Netflix 2013 "Long Term View" Report), https://www.cpj.fyi/content/files/2022/12/Netflix-Long-Term-View.pdf [https://perma.cc/T3AS-J8RY].

[39] *See* The Gauge, Nielsen, https://www.nielsen.com/data-center/the-gauge [https://perma.cc/HPS5-GK5S] (last visited Feb. 10, 2026). Netflix accounts for approximately 38.1% of the market by siloing streaming services from all non-SVOD firms (i.e., firms whose business model is not to charge monthly subscriptions for access to on-demand video). Although Nielsen does track AppleTV+ viewership, Nielsen's December 2025 report did not include AppleTV+. *See Apple TV+ Now Counted In Nielsen's Streaming Charts*, Apple Insider (Oct. 21, 2021), https://appleinsider.com/articles/21/10/22/apple-tv-now-counted-in-nielsens-streaming-charts [https://perma.cc/HD8A-A3VH] (noting, in streaming charts "otherwise dominated by Netflix," that Nielsen has begun to track AppleTV+ viewership).

71.    Nielsen's streaming data comes from households with "Streaming Meters" attached to their TVs, which track and report viewership data to Nielsen in much the same manner as the classic "Nielsen Box."[40]  Based on Nielsen metrics, Netflix holds nearly two times the market share of its next closest competitor, Disney+/Hulu (Nielsen combines the two).

72.    The Hollywood Reporter examined Netflix's dominance over the SVOD Market in 2025.[41]  Netflix's *KPop Demon Hunters* was the most streamed movie of the year, more than doubling the total minutes viewed compared to second place.  Netflix's *Happy Gilmore 2* was the most streamed "general audience" movie of the year. For original content produced by SVOD firms, Netflix's margin of victory was even larger.  *Stranger Things* was so popular that, even if its viewing totals were limited to the last five weeks of 2025, it would still have beat the second-place show—Squid Games, also from Netflix—by nearly three billion viewing minutes. Of the top original series of 2025, seven of ten belonged to Netflix, and of the top "general interest" movies of 2025, five belonged to Netflix.

73.    By other metrics, Netflix stands out, too.  According to Hub Entertainment Research, nearly one-fifth of TV viewers default to Netflix (Hulu, with 5%, came next for SVOD firms).[42]  When asked which provider users would keep if they could only keep one, Netflix dominated other SVOD firms with 29% of users selecting it as the one provider they would keep in a forced choice scenario.  That is more than double the users that selected Prime Video, Disney+, or Hulu.  Even as new streaming services have emerged and established themselves, Netflix has remained the prevalent single force in SVOD with consumers.

---

[40]    See *The Gauge Methodology FAQ*, Nielsen, https://www.nielsen.com/data-center/the-gauge/#Methodology-FAQ [https://perma.cc/GF2U-WZB3] (last visited Feb. 10, 2026).

[41]    *See* Rick Porter,*'Bluey' Defeats 'Stranger Things,' Everything Else to Retain Title as Most Streamed Show in 2025,* Hollywood Reporter (Jan. 28, 2026), https://www.hollywoodreporter.com/tv/tv-news/bluey-stranger-things-2025-year-end-streaming-charts-1236487118/ [https://perma.cc/A5HR-NQZG].

[42]    See Erik Gruenwedel, Hub: Majority of Consumers Start TV Viewing With SVOD Services, Mostly Netflix, MediaPlayNews (Sept. 15, 2025), https://www.mediaplaynews.com/hub-consumers-start-with-svod-netflix-for-tv-viewing [https://perma.cc/QL3G-4VBC].

## II.      THE PROSPECTIVE MERGER

74.      Starting in July 2024, WBD began exploring the possibility of spinning off its streaming and studio businesses from its legacy television networks.[43]  WBD owns HBO Max, one of the most significant SVOD firms and Netflix competitors.

75.      Later in 2024, WBD announced its intention to reorganize into two units: Global Linear Networks and Streaming & Studios.[44]  Global Linear Networks would house traditional linear television business assets that aired news, sports, scripted and unscripted programming at fixed times.  Streaming & Studios would house its streaming platforms, including HBO Max, and its content producing studio assets.  WBD described the reorganization as increasing "optionality to pursue further value creation opportunities for both divisions in an evolving media landscape."[45]

76.      In June 2025, WBD revised its plan.  Now, it would split into two public companies by 2026.[46]  The split would mirror the reorganization with one company holding streaming— including HBO Max—and studios, and the other company holding legacy linear television assets. Concurrent news coverage flagged "building up streaming platforms and particularly reaching profitability" as a "key focus" of the decision to split the entity.[47]

---

[43] Maria Heeter, et al., *Warner Bros Discovery Drafts Break-Up Plan*, Financial Times (July 18, 2024), https://www.ft.com/content/be716ec2-1c02-467c-94af-7c8ef9ae1963     [https://perma.cc/ C5F7-U3GR].

[44] *Warner Bros. Discovery Announces New Corporate Structure To Enhance Strategic Flexibility*, WBD (Dec. 12, 2024), https://www.wbd.com/news/warner-bros-discovery-announces-new-corporate-structure-enhance-strategic-flexibility [https://perma.cc/VNJ7-G25R].

[45] *Id.*

[46] *Warner Bros. Discovery To Separate into Two Leading Media Companies*, Warner Bros. Discovery (June 9, 2025), https://www.wbd.com/news/warner-bros-discovery-separate-two-leading-media-companies [https://perma.cc/XJ5M-P3VL].

[47] Lillian Rizzo, *Warner Bros. Discovery To Split into Two Public Companies by Next Year*, CNBC (June 9, 2025), https://www.cnbc.com/2025/06/09/warner-bros-discovery-to-split-into-two-public-companies-by-next-year.html [https://perma.cc/LQ2Q-ZNV9].

Complaint—Case No. _____

77.     By September 2025, Paramount Skydance ("Paramount") was preparing to bid to acquire WBD in its entirety.[48]  Senator Elizabeth Warren described the Paramount-WBD merger prospect as a "dangerous concentration of power" and called for regulatory authorities to block it.[49]

78.     In October 2025, Paramount ultimately made a series of increasing offers to acquire WBD, all of which WBD's board rejected.[50]  The first offer was at $19 a share, the second $22 a share, and the third $23.50 a share.  In pitching itself as an appropriate acquirer of WBD, Paramount pointed out that other "potential acquirers of WBD—today or in the future—would need to overcome significant (perhaps insurmountable) hurdles given their dominant market positions."

79.     Shortly after WBD rejected the series of Paramount bids, Netflix and Comcast readied bids of their own.[51]

80.     The prospect of Netflix acquiring WBD attracted pointed scrutiny.  For example, Representative Darrell Issa reached out to leadership at the Department of Justice and the Federal Trade Commission to raise antitrust concerns.[52]  He observed that "Netflix currently wields unequaled market power" and that adding WBD's streaming and content assets would "push[] the combined entity above a 30 percent share of the streaming market: a threshold traditionally viewed

---

[48] Jessica Toonkel, *Paramount Skydance Prepares Ellison-Backed Bid for Warner Bros. Discovery*, WSJ (Sept. 12, 2025), https://www.wsj.com/business/media/paramount-skydance-prepares-ellison-backed-bid-for-warner-bros-discovery-0b921c20 [https://perma.cc/X2GP-379V].

[49] Loree Seitz, *Elizabeth Warren Warns Paramount-Warner Bros. Discovery Merger "Must Be Blocked": "Dangerous Concentration of Power,"* TheWrap (Sept. 11, 2025), https://www.thewrap.com/elizabeth-warren-warns-paramount-warner-bros-discovery-merger-blocked/ [https://perma.cc/7GKE-DU4R].

[50] Lauren Hirsch & Andrew Ross Sorkin, *Three Offers in One Month: Paramount's Secret Pursuit of Warner Bros. Discovery*, N.Y. Times (Oct. 22, 2025), https://www.nytimes.com/2025/10/22/business/dealbook/paramounts-secret-bids-warner-bros-discovery.html [https://perma.cc/Q983-CP6E].

[51] Dawn Kopecki, et al., *Exclusive: Netflix Taps Bank To Explore Bid for Warner Bros. Discovery*, Reuters (Oct. 31, 2025), https://www.reuters.com/business/media-telecom/netflix-taps-bank-explore-bid-warner-bros-discovery-2025-10-30/ [https://perma.cc/MJH9-YVMA]; Dawn Chmielewskit, et al., *Exclusive: Comcast hires Bankers To Explore Bid for Warner Bros. Discovery*, Reuters (Nov. 6, 2025), https://www.reuters.com/business/finance/comcast-hires-bankers-explore-bid-warner-bros-discovery-2025-11-06/ [https://perma.cc/8PKE-ZB27].

[52] Letter from U.S. Rep. Darrell Issa to Pam Bondi, Attorney General, Gail Slater Assistant Attorney General, Antitrust Division, and Andrew Ferguson, Federal Trade Commission Chairman (Nov. 13, 2025), https://issa.house.gov/sites/evo-subsites/issa.house.gov/files/evo-media-document/11.13.25-netflix-doj-letter.pdf [https://perma.cc/9FJC-8EZ6].

as presumptively problematic under antitrust law."[53]  Representative Issa urged officials to "protect a critical American industry, enhance consumer choice, and safeguard vital American jobs."[54]

81.     In late November 2025, Paramount, Netflix, and Comcast all submitted bids to acquire WBD or portions thereof.[55]  Netflix and Comcast both sought to acquire only the film production and streaming assets, and Paramount again sought to purchase WBD in its entirety.

82.     Paramount reiterated its view that a Netflix/WBD transaction would "never close" because it would "entrench and extend Netflix's global dominance" in violation of applicable antitrust laws.[56]

83.     Netflix and WBD entered into an Agreement and Plan of Merger on December 4, 2025, which they announced publicly the following day.[57]  Under that agreement, WBD shareholders would receive $27.75 in a mixture of $23.25 in cash and $4.50 in Netflix shares, and Netflix would acquire WBD's streaming and studio assets (the "WBD Targets"), leaving behind the legacy linear television assets.[58]

---

[53] *Id.*

[54] *Id.*

[55] Alex Sherman & Lillian Rizzo, *Paramount, Comcast, Netflix Submit Bids for Warner Bros. Discovery*, CNBC (Nov. 21, 2025), https://www.cnbc.com/2025/11/21/warner-bros-discovery-wbd-bids-paramount-comcast-netflix.html [https://perma.cc/X38Q-3TA2].

[56] Joe Flint, Dave Michaels, & Lauren Thomas, *Paramount Raises Concerns About Netflix's Bid for Warner Bros. Discovery*, Wall St. J. (Dec. 4, 2025), https://www.wsj.com/business/media/paramount-raises-concerns-about-netflixs-bid-for-warner-bros-discovery-1ef9a8c5 [https://perma.cc/YF5D-BXS5].

[57] Agreement and Plan of Merger Among Warner Bros. Discovery, Inc., New Topco 25, Inc., Netflix, Inc. and Nightingale Sub, Inc. (Dec. 4, 2025), https://www.sec.gov/Archives/edgar/data/1065280/000119312525308651/d65144dex21.htm [https://perma.cc/QHH9-TB82].

[58] Netflix, Inc., Form 8-K (Dec. 5, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001065280/000119312525308651/d65144d8k.htm [https://perma.cc/8JAL-TFRB].

21

84.    The parties amended their agreement on January 19, 2026 (the "Merger Agreement").[59]   Under the Merger Agreement, WBD shareholders would receive $27.75 in cash instead of a mix of cash and stock.[60]

85.    The Merger Agreement's conditions precedent to closing included obtaining requisite regulatory approvals.  Merger Agreement § 7.1.

86.    While the Merger Agreement is pending, WBD is prohibited from many major business activities like making significant capital expenditures or entering material contracts. Merger Agreement § 6.1(a).  These provisions weaken WBD's ability to compete in the SVOD market while the Merger Agreement is pending.

87.    The Merger Agreement obligates all parties to use best efforts to consummate the acquisition including by cooperating with applicable government authorities in seeking regulatory approvals.  Merger Agreement § 6.4.  But it also excuses Netflix from undertaking any action that would constitute a "Burdensome Condition" as part of the regulatory approval process.  Merger Agreement § 6.4(e).  These provisions ensure that Netflix's ability to compete in the SVOD market remains unimpeded while the Merger Agreement is pending.

88.    In publicizing the deal, Netflix touted the acquisition of HBO Max and "[o]ne of the deepest film & TV libraries in the world."[61]   On the acquisition of WBD's content library, Netflix explained this would allow Netflix to "deliver more quality entertainment for our members," "offer[] audiences more of what they love," and "attract and retain more subscribers."[62]   Netflix's materials

---

[59] Amended and Restated Agreement and Plan of Merger Among Warner Bros. Discovery, Inc., New Topco 25, Inc., Netflix, Inc. and Nightingale Sub, Inc. (Jan. 19, 2026), https://www.sec.gov/Archives/edgar/data/1065280/000119312526015951/d37713dex21.htm    [https://perma.cc/8JAL-TFRB].

[60] Dawn Chmielewski, *Netflix Will Now Pay All Cash for Warner Bros To Keep Paramount at Bay*, Reuters (Jan. 21, 2026), https://www.reuters.com/business/finance/netflix-submits-amended-all-cash-offer-warner-bros-wins-board-support-2026-01-20/ [https://perma.cc/99XQ-2NL3].

[61] *Netflix To Acquire Warner Bros. Presentation*, Netflix (Dec. 5, 2025), https://cdn.prod.website-files.com/693f71cbcfa8516005cead0c/6941aac6683ec42d3ce9638d_Netflix_WB_Presentation.pdf [https://perma.cc/GC3P-FYNS].

[62] *Id.*

did not suggest it was committed to continue licensing the WBD content library to other SVOD firms.

89.    In a December 5, 2025, M&A call, Netflix leadership emphasized similar points about the acquisition.[63] Co-CEO Ted Sarandos highlighted WBD's "top time franchises like Harry Potter" and "shows like Friends and Game of Thrones," as well as HBO Max's "large and loyal audience with a streaming subscriber base of roughly $100 million" and predicted that Netflix's "best-in-class streaming service" would "bring these franchises, brands, shows and movies to a larger audience than ever before."[64] Co-CEO Gregory Peters explained that WBD "has one of the world's deepest libraries of IP, of films and TV shows" and that "for our members, that means more bang for their buck."[65]

90.    The public reaction to Netflix's acquisition of the WBD Targets (the "Merger") was swift and focused on the anti-consumer effects that would follow from a post-acquisition Netflix attaining monopoly status in the SVOD market.

91.    Senator Elizabeth Warren characterized the deal as "an anti-monopoly nightmare" in which the resulting entity would wield "control of close to half of the streaming market" and "force Americans into higher subscription prices and fewer choices."[66]

92.    Senator Mike Lee stated that the Merger should "send alarm to antitrust enforcers around the world."[67]

93.    The Writer's Guild of America stated that the "world's largest streaming company swallowing one of its biggest competitors is what antitrust laws were designed to prevent" and that

---

[63] Netflix, Inc. NasdaqGS:NFLX M&A Call, S&P Global Market Intelligence (Dec. 5, 2025), https://s22.q4cdn.com/959853165/files/doc_events/2025/Dec/05/Netflix-Inc-_M-A-Call_2025-12-05T00_00_00_English.pdf [https://perma.cc/4RN7-2MXS].

[64] Id.

[65] Id.

[66] Press Release, U.S. Sen. Elizabeth Warren, Warren on Netflix-Warner Bros. Proposed Deal: "Anti-Monopoly Nightmare" (Dec. 5, 2025), https://www.warren.senate.gov/newsroom/press-releases/warren-on-netflix-warner-bros-proposed-deal-anti-monopoly-nightmare [https://perma.cc/7AND-396X].

[67] David Goldman, *Netflix Has a Big Unanswered Question.  That May Kill Its Warner Bros. Deal*, CNN (Dec. 6, 2025), https://www.cnn.com/2025/12/06/media/netflix-warner-bros-antitrust [https://perma.cc/JBN9-ET4Q].

the Merger would "raise prices for consumers, and reduce the volume and diversity of content for all viewers."[68]

94.    As time passed since the initial deal announcement, a broad cross-section of stakeholders continued to express public concern over the anti-competitive effects of the Merger and provided more nuanced explanations as to what facts underly these concerns.

95.    Tim Wu, a law professor and antitrust expert, observed that Netflix and WBD subsidiary HBO Max are "direct competitors in premium streaming services, where Netflix is No. 1 and HBO-Discovery is No. 3 or 4, depending on which ranking system you use" so that "[m]erging them" and "hurt[] consumers by making price increases easier."[69]

96.    Senator Mike Lee explained that the deal would post risks of a "cumulative content concentration and the potential for reduced competition across streaming markets," citing Netflix's extensive past practice of obtaining long-term licensing granting it the exclusive right to stream third party content on its platform alone as informing this concern.[70]

97.    A bipartisan group of former state attorneys general wrote Department of Justice officials to "urge careful scrutiny of the reported acquisition of Warner Bros. Discovery by Netflix," citing concerns that "ongoing consolidation in media, entertainment, and tech markets" risked "harming consumers, suppressing competition, weakening bargaining power for creators and workers, and entrenching dominant firms.[71]   The Merger "would combine the largest global

---

[68] *WGA Statement on the Acquisition of Warner Bros. Discovery by Netflix*, Writers Guild of America West (Dec. 5, 2025), https://www.wga.org/news-events/news/press/2025/wga-statement-on-the-acquisition-of-warner-bros-discovery-by-netflix [https://perma.cc/5QUJ-AFRD].
[69] Tim Wu, *Both Plans To Buy Warner Bros. Are Illegal*, N.Y. Times (Dec. 9, 2025), https://www.nytimes.com/2025/12/09/opinion/netflix-paramount-warner-bros.html [https://perma.cc/K7KR-MNT8].
[70] Letter from U.S. Sen. Mike Lee to Ted Sarandos, Netflix Co-CEO, Greg Peters, Netflix Co-CEO, and David Zaslav (Warner Bros. Discovery, Inc. CEO) (Jan. 22, 2026), https://thecapitolforum.com/wp-content/uploads/2026/01/Letter-re-Netflix-WB-1.22.26.pdf [https://perma.cc/3P9Q-6PG5].
[71] Charles Condon, Former S.C. Atty. Gen. et al., Letter to Attorney General Bondi and Assistant Attorney General Slater (Feb. 4, 2026).

Complaint—Case No. _____

streaming service (Netflix) with one of the most creative content producers (WBD)" and "raise serious antitrust concern" including increased leverage over consumers.[72]

### III.     THE U.S. SVOD MARKET IS THE RELEVANT MARKET UNDER THE ANTITRUST LAWS

98.     The United States Subscription Video on Demand Market is the relevant market under which to evaluate the proposed Merger.  It is composed of firms that offer streaming direct-to-consumer video to consumers in the United States, because content is licensed by country. Participants include Netflix, HBO Max, Prime Video, AppleTV+, Peacock, and certain others. Market evidence—including statements by Netflix executives—confirms that SVOD firms have discrete characteristics, including the use of recommendation algorithms and the curation of long-form scripted media, and are responsive to distinct market forces.

99.     Netflix created the SVOD Market and has consistently distinguished it from other related but distinct markets like cable and social media.  In a 2013 report, Netflix explained the differences between its business model and those of incumbent cable providers and social media platforms:[73]

> We are not a generic "video" company that streams all types of video such as news, user-generated, sports, music video, or reality.  We are movies and TV shows.

> We are counter-positioned against the hassles, complexity, and frustration that embodies most MVPD relationships with their customers.  We strive to be extremely straightforward and simple.

> There is no better embodiment of this than our no-hassle online cancellation.  Members can leave when they want and come back when they want.

> We are about the freedom of on-demand and the fun of indulgent viewing.  We are about the flexibility of any screen anywhere any time.  We are about fantastic content that is increasingly only available on Netflix.

100.     The SVOD Market is still characterized by those principles: non-traditional media firms that stream traditional, produced media—movies and TV shows—for subscribers.

---

[72] *Id.*
[73] Netflix, *supra* note 38.

Complaint—Case No. _____

Distinguishing Characteristics

101.    The SVOD Market is a distinct market entity with discrete characteristics.  SVOD firms are distinguished by their synthesis of traditional forms of media (i.e., long-form TV shows and movies) with contemporary modes of distribution (i.e., on-demand streaming, seamlessly accessible across various platforms, with algorithm-driven recommendations).[74]

102.    First, **the SVOD Market has clear, distinguishing characteristics** that differentiate competitors from non-competitors, including traditional media firms, film studios, social media apps, or short-form online video platforms.  SVOD firms must build libraries of licensed and original content for their subscribers. There are no good substitutes for the long-form, scripted media SVOD firms need. They may either purchase the licensing rights from existing media conglomerates or fund the production of their own shows and movies.

103.    Firms in the SVOD Market have distinct strategies for licensing and producing content libraries that non-SVOD firms.  Today, SVOD firms are the "primary driver of growth" in movies and TV, on track to spend over one hundred billion dollars on content in 2026.[75]  Why so much spend?  As one researcher told ArsTechnica, SVOD firms produce new content and license existing content to bring on new subscribers "while also providing existing audiences with a steady stream of weekly content installments to help them remain engaged long-term."[76]  While legacy studios fund shows and movies for licensing and distribution elsewhere, SVOD firms do so to build out their own libraries.

104.    Conversely, short-form online video platforms like YouTube or TikTok neither produce original content nor license or distribute content from production companies.  As Netflix Co-CEO Greg Peters stated, Netflix "fulfills an important and differentiated need" for viewers "who

---

[74] *Subscription Video on Demand Market (2025 - 2030)*, Grand View Research, https://www.grandviewresearch.com/industry-analysis/subscription-video-on-demand-svod-market-report [https://perma.cc/Z4NL-2RUL].

[75] Max Goldbart, *Streamer Spend to Top $100BN For First Time in 2026*, Yahoo News UK (Jan. 12, 2026), https://uk.news.yahoo.com/streamer-spend-top-100b-first-111736108.html [https://perma.cc/ZLL6-F8LT].

[76] Scharon Harding, *Streaming Used To Make Stuff Networks Wouldn't.  Now It Wants Safer Bets*, ArsTechnica (Feb. 13, 2025), https://arstechnica.com/culture/2025/02/streaming-used-to-make-stuff-networks-wouldnt-now-its-seeking-safer-bets/ [https://perma.cc/H8XF-7R2J].

Complaint—Case No. _____

really want amazing, spectacle movies and TV shows."[77]   A social media like platform, like YouTube or TikTok, could never produce a *Stranger Things*-like project: "It's really hard to imagine how that kind of big creative bet would happen, would be possible, within YouTube's model."[78] And temporary, abortive forays by short-form online video platforms into the SVOD Market do not contravene these principles; YouTube's brief attempt to produce original content, YouTube Originals, does not make it an SVOD Market.[79]

105.   This is because products are only "reasonably interchangeable if consumers treat them as 'acceptable substitutes.'"   *FuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 137 n.33 (S.D.N.Y. 2024) (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002)), *appeal dismissed*, No. 24-2210, 2025 WL 523263 (2d Cir. Jan. 8, 2025).   No user would be able to use YouTube or TikTok to access the kinds of long-form, scripted media that SVOD firms make available on demand.   The same is certainly true of traditional media conglomerates, who may take an active role in producing and creating content, but nonetheless lack any role in making it available to stream online.

106.   SVOD firms therefore participate in a distinct market: the licensing and distribution of third-party content for users to access on demand on a subscription basis. SVOD firms use third-party content to supplement their efforts.

107.   The markets served by SVOD firms and short-form online video platforms are distinct, and that distinction is well understood and broadly recognized.   This can be seen from the

---

[77] Jill Goldsmith, *Netflix Acknowledges Mighty YouTube Rival but Says Services "Feed Each Other" and Only One Takes Big Creative Bets*, Deadline (July 18, 2024) https://deadline.com/2024/07/netflix-youtube-television-viewing-rivals-1236015089/ [https://perma.cc/6BKJ-VQGR].

[78] *Id.*

[79] *See* Todd Spangler, *Why YouTube Exited the Original Content Business: "We Weren't Good a Picking Content"* (Mar. 6, 2026), https://variety.com/2025/digital/news/why-youtube-exited-original-content-1236326071/ [https://perma.cc/64FC-H8DZ].   The reverse is true in reverse. Netflix's "testing" of vertical, short-form content does not make it a competitor in the short-form online video platform market by any reasonable definition of a relevant market.   Caitlin Huston, *Netflix Is Testing Vertical Video Features for Mobile* (Jan. 20, 2026), https://www.hollywoodreporter.com/business/business-news/netflix-testing-vertical-video-features-for-mobile-1236479365/ [https://perma.cc/BYL5-QBVP].

Complaint—Case No. _____

words of media and legal commentators like Professor Tim Wu, an expert in competition law and technology. Professor Wu brushed off an anticipated argument that Netflix operated in the same market as social media companies like TikTok or YouTube. "The reasoning is driven by a false equivalence: that because watching 'The Wire' and watching a TikTok video both involve a moving image, they are rivals for your attention. This is a little like insisting that Maxim's and Pizza Hut are competitors because they both serve food in exchange for money. The law can't be that stupid."[80]

108.    Hal Singer—another antitrust expert—made similar observations about the SVOD Market and concluded that user-generated video content firms were not part of that market: "Just because two services compete for viewers' attention does not imply that they are in the same antitrust market. If policymakers included all things that vie for viewers' attention, they would have to include gorgeous sunsets alongside Netflix, YouTube and TikTok in one massive attention market."[81] Singer further observed that if Netflix, YouTube, and TikTok were part of the same relevant market, one would expect Netflix price increases to result in subscribers cancelling their subscriptions in favor of YouTube or TikTok, which are available as free services. That has not occurred because the SVOD Market is distinct from the market occupied by user-generated video platforms.

109.    These observations align with leading precedent on relevant market definitions. Courts have recognized that "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) (defining the relevant market as the of office supplies through superstores, rather than through any retailer). A relevant market may exist for firms that serve distinct customers, paying distinct prices because they seek to use a distinct cluster of products. *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039 (D.C. Cir. 2008) (reversing district and holding the FTC put forth sufficient evidence to establish premium

---

[80] Wu, *supra* note 699.

[81] Hal Singer, *Netflix Dominates Streaming. No Wonder It's Trying To Redefine the Market*, Fortune (Feb. 7, 2026), https://fortune.com/2026/02/07/netflix-streaming-warner-brothers-ted-sarandos-testimony-congress-monopoly-man/ [https://perma.cc/8L6T-NBG9].

natural and organic supermarkets (PNOS) as distinct from conventional supermarkets, as the relevant market). Nor does the existence of overlapping customers defeat a relevant market definition that bears these characteristics. *Id*. at 1040 (existence of customers that "cross-shop" at PNOS, conventional supermarkets, and convenience stores for products carried by all three does not mean there is no definable PNOS market).

110. Netflix offers new and existing studio-produced television shows and movies to customers who are willing to pay a monthly fee in order to view those studio-produced television shows and movies on demand. YouTube, TikTok and similar firms offer user-produced videos for no charge. The television shows and movies available on Netflix are rarely or never available for viewing on YouTube. The user-produced or supplied videos available on YouTube, TikTok and similar firms are rarely or never available on Netflix. Netflix offers distinct clusters of products at distinct prices as compared to YouTube, TikTok, and similar firms. YouTube, TikTok, and similar firms and are not substitutes for Netflix.

111. Besides home viewing, SVOD firms' most distinct cultural contribution has been a market shift in viewing habits. While SVOD firms have tried all sorts of release formats, they overwhelmingly choose to release entire seasons at once, for "binge watching":



112.    Historically, linear television shows would release new episodes weekly, at a fixed time on a fixed schedule.  But "binge-friendly viewing" is fundamental to SVOD firms' engagement models.  As Netflix itself reported in a 2022 letter to shareholders:[82]

> We think our bingeable release model helps drive substantial engagement, especially for newer titles.  This enables viewers to lose themselves in stories they love. . . .

> It's hard to imagine, for example, how a Korean title like Squid Game would have become a mega hit globally without the momentum that came from people being able to binge it.  We believe the ability for our members to immerse themselves in a story from start to finish increases their enjoyment but also their likelihood to tell their friends, which then means more people watch, join and stay with Netflix.

113.    SVOD firms' most distinguishing feature, however, is that they provide subscribers with unlimited, on-demand access to a curated library of long-form and scripted content. Subscribers to SVOD services receive access to hugely diverse catalogs of shows and movies, enhanced by recommendation algorithms tooled by user data, that update regularly with new and

---

[82] Netflix, Letter to Shareholders (Oct. 18, 2022), https://static.poder360.com.br/2022/10/Netflix-3T2022.pdf [https://perma.cc/9552-WLAE].

Complaint—Case No. _____

exciting options.  The availability of curated content, as well as the complex technical infrastructure that makes it all possible, lack comparison in other industries.

114.    Second, **market analysts and media commentators figures recognize the SVOD Market's distinctive characteristics**.

115.    Financial analysts pay specific attention to the SVOD Market, monitoring its impressive year-over-year growth.  One such report from Grand View Research suggests the SVOD Market will continue to grow expeditiously:[83]



116.    Business schools broadly analyze the move from traditional cable to internet streaming and video-on-demand,[84] chronicling the "distinctive strategy and culture" of SVOD firms contraposed to those of the "entertainment firms and cable networks" that make up the legacy media sphere.[85]  Media observers characterize the SVOD Market similarly.  Top tech and media reporters

---

[83] Grand View Research, *supra* note 74.

[84] Won-Yong Oh & Duane Myer, Netflix: International Expansion (Apr. 26, 2016), *available at* https://store.hbr.org/product/netflix-international-expansion/W16236?srsltid= AfmBOoo6pHun6gRq6_PC8Ygc-G3FoZyVl7AqSOdpydqhlRuU_jp6hthT [https://perma.cc/Y4NP-7HCC].

[85] Donald Sull, *Netflix Goes to Bollywood* (Jan. 30, 2021), https://mitsloan.mit.edu/teaching-resources-library/netflix-goes-to-bollywood [https://perma.cc/4M65-PEH5].

Complaint—Case No.  _____

comment not just on the performance of individual SVOD firms, but on the SVOD Market itself.[86]

SVOD Market analysis is separate from, or in comparison to, analysis of legacy media performance.

117.    Third, firms in the SVOD Market **use recommendation algorithms based on aggregated user data to recommend structured content** to users.

118.    Netflix's propriety recommendation algorithm came first.  Today, every streaming service has its own.  Among viewers, SVOD algorithm recommendations are now the favorite means of deciding what to watch next.[87]  These algorithms combine viewing history with user ratings, viewer habits and preferences (e.g., whether users prefer movies or shows, if they watch entire seasons at once, what genres they like the most and least), and demographic data to determine what users should be shown.

119.    These algorithms benefit from more subscribers.  Algorithms compare subscribers' tastes, offering recommendations based on what similar subscribers have enjoyed.[88]  SVOD firms use algorithms to decide what sorts of shows and movies to prioritize, influencing the creation of original content.  To lower their churn rates, or the number of users who unsubscribe, and increase

---

[86] *See, e.g.*, *Streaming Used To Make Stuff Networks Wouldn't. Now It Wants Safer Bets*, Ars Technica (Feb. 13, 2025), https://arstechnica.com/culture/2025/02/streaming-used-to-make-stuff-networks-wouldnt-now-its-seeking-safer-bets/ [https://perma.cc/X2YB-KGA6]; David Bloom, *Netflix To Raise Content Spending to $18 Billion, Challenging Competitors*, Forbes (Mar. 7, 2025), https://www.forbes.com/sites/dbloom/2025/03/06/bad-news-hollywood-and--investors-netflix-content-spending-to-rise-11/ [https://perma.cc/2MN8-8AQ7] ("Netflix is still well ahead of every other SVOD platform . . . ."); Singer, *supra* note 81 ("Under a reasonable definition of the SVOD market, Netflix's market dominance is impossible to ignore."); Paul Lee, *The Future of Streaming: Will SVOD Shift Toward Content Aggregators?*, Wall St. J. (Jan. 7, 2025), https://deloitte.wsj.com/cmo/the-future-of-streaming-will-svod-shift-toward-content-aggregators-bb3de7e0 [https://perma.cc/JEM2-JX7U] ("The 2010s were characterized by two adoption trends in the streaming video-on-demand (SVOD) industry . . . ."); Liz Shackleton, *Thailand Emerges as Biggest Premium SVOD Market in Southeast Asia—MPA Research*, Deadline (Nov. 4, 2025), https://deadline.com/2025/11/thailand-taiwan-premium-svod-streaming-netflix-trueid-mpa-1236606277/ [https://perma.cc/Z4A2-658K] ("Netflix is the biggest player in premium SVOD in the Thai market . . . .").

[87] Sam Nursall, *Streaming Algorithms Now Beat Word-of-Mouth for TV and Movie Picks*, Ampere Analysis (Mar. 25, 2025), https://www.ampereanalysis.com/insight/streaming-algorithms-now-beat-word-of-mouth-for-tv-and-movie-picks [https://perma.cc/9M5C-K7BK].

[88] Devyn Hinkle, *How Streaming Services Use Algorithms*, Arts Mgmt. & Tech. Lab'y (Aug. 18, 2021), https://amt-lab.org/blog/2021/8/algorithms-in-streaming-services [https://perma.cc/HN5N-FCBQ].

user engagement, SVOD firms use algorithms to decide where their money is best spent. Last, firms in the **SVOD Market are responsive to different market signals and appeal to different customer bases** as compared to firms in other distinct markets.

120.    Users subscribe to multiple SVOD firms at once to maximize the shows and movies they have access to. That is not the case for subscribers to traditional cable, who rarely or never subscribe to multiple cable television services. And short-online video platforms have no fees or membership requirements beyond a download; their revenue is advertising dependent. This ultimately means SVOD firms appeal to customer bases distinct from other video streaming applications. SVOD subscribers, unlike short-form video consumers, engage with long-form or scripted media produced by production companies and studios.

121.    Further, producing and licensing scripted and long-form content requires engaging with traditional modes of media production, including renting studio and production facilities, as well as the both the technical staff and the "cast, crew, and extras" needed to staff them.[89] Content producers for short-online video platforms produce on spec without oversight or financial involvement from the platforms that distribute them.

122.    Although cable subscription fees fluctuate based on the costs of "equipment rentals, setup fees, broadcast surcharges, [and] regional sports fees," SVOD prices have been driven so high that they "no longer deliver the obvious savings they once promised."[90] As a result, although both cable and SVOD prices have risen, they have done so at different paces and in response to different market forces.[91]

---

[89] Alex Ritman & Scott Roxborough, *Netflix Global Real Estate Grab: How the Streamer is Expanding from London to Singapore*, Hollywood Reporter (Aug. 12, 2019) https://www.hollywoodreporter.com/news/general-news/london-singapore-how-netflix-is-expanding-around-world-1229815 [https://perma.cc/5TGA-RXSF].

[90] Michelai Graham, *The Economics of Streaming vs. Cable in 2025*, Boardroom (Sept. 11, 2025), https://boardroom.tv/streaming-cable-economics-2025 [https://perma.cc/7L5Q-GHRL].

[91] Alex Weprin, *"Streamflation" Is Real: U.S. Inflation Data Shows Soaring Price of Streaming Video Services,"* Hollywood Reporter (Jan. 13, 2026) https://www.hollywoodreporter.com/business/business-news/streamflation-is-real-us-government-data-streaming-video-1236472184 [https://perma.cc/H9SP-WS3H].

Complaint—Case No. _____



# Inflation Watch

Overall inflation cooled in December, but streaming video prices soared by nearly 20%.

| | |
|---|---|
| Subscription and rental of video and video games | **19.5%** |
| Purchase, subscription, and rental of video | **7.6%** |
| Admission to movies, theaters, and concerts | **2.4%** |
| Recorded music and music subscriptions | 1.1% |
| Cable, satellite, and live streaming television service | 1.1% |
| Food | 0.7% |
| Apparel | 0.6% |
| Rent | 0.3% |
| Energy | 0.3% |

SOURCE: BUREAU OF LABOR STATISTICS (JAN. 13, 2026); SEASONALLY ADJUSTED PERCENT CHANGE NOV. 2025- DEC. 2025.

123.    Because firms in the SVOD Market appeal to different market segments, they respond to different market and price signals.  SVOD firms have upped prices in response to market consolidation[92] and the difficulty of building "on-demand access to large libraries of costly, desirable, and original content."[93]  These price effects have only compounded as the market has matured, as an increasing number of SVOD firms are forced to compete over a limited quantity of licensable content.

124.    Thus, the SVOD Market is clearly distinguishable.  It is composed of firms that curate libraries of original and licensed long-form content, allowing subscribers to—for a monthly fee—stream those libraries on-demand over the internet.  A less doctrinal market definition—like the competition for "attention" that executives at Netflix have referenced[94]—would mean Netflix would

---

[92] *See* Meg James, *Disney to Integrate Hulu and Disney+ in 2026*, L.A. Times (Dec. 30, 2025), https://www.latimes.com/entertainment-arts/business/story/2025-12-30/disney-to-integrate-hulu-disney-in-2026 [https://perma.cc/WT72-F5F5] (describing one such example of consolidation in the SVOD Market by major competitors).

[93] Scharon Harding, *Federal Data Underscores Meteoric Rise of Streaming Subscription Prices in 2025*, Ars Technica (Jan. 14, 2026), https://arstechnica.com/gadgets/2026/01/federal-data-underscores-meteoric-rise-of-streaming-subscription-prices-in-2025/ [https://perma.cc/66SV-6L5Q]

[94] Alex Weprin, *Ted Sarandos Warns "Instagram Is Coming" as He Lays Out Competitive Landscape for Netflix*, Hollywood Reporter (Jan. 20, 2026),

34

compete with effectively all intentional human activity, including, in the words of Netflix co-founder and Board Chairman Reed Hastings, "competing with sleep, on the margin."[95]

### Geographic Market

125.    The relevant geographic market is SVOD firms within the United States.  Streaming content is regional; Netflix's library in America is radically different than even its Canadian or British library.  SVOD firms require users from different countries to agree to different terms and conditions based on country of residence.  Although SVOD firms are available across the globe, they comply with regional censorship laws and limit content access by country.

126.    Although SVOD firms produce and distribute foreign-language content cross-regionally, it must be "localized," through subtitles or "dubbed" voice acting, for audiences unfamiliar with the language.  For example, Netflix's original reality TV show *Love is Blind* has numerous spinoffs in various languages, including Brazilian Portuguese and Arabic.  Each is subtitled for English.

### Barriers to Entry

127.    There are significant barriers to entering the SVOD market.  Namely, Netflix's power in the SVOD Market is maintained by CARDS: Content Acquisition, Research & Development, and Subscriber barriers to entry.

128.    First, **Content Acquisition**.  Firms in the SVOD Market must license or produce a large-enough library of quality shows and movies to attract subscribers willing to either pay or sit through ads.  SVOD libraries are built on time-limited licensing contracts, and consumer tastes are

---

https://www.hollywoodreporter.com/business/digital/netflix-instagram-threat-regulators-1236479345 [https://perma.cc/2N98-4N8R] ("More broadly, we compete for people's attention across an even wider set of options that include streaming, broadcast, cable, gaming, social media, big tech video platforms.").

[95] Alex Hern, *Netflix's Biggest Competitor? Sleep*, Guardian (Apr. 18, 2007), https://www.theguardian.com/technology/2017/apr/18/netflix-competitor-sleep-uber-facebook [https://perma.cc/9ZKX-UTK9].  *See also* Robert Langer & Simon B Eickhoff, *Sustaining Attention to Simple Tasks*: *A Meta-Analytics Review of the Neural Mechanisms of Vigilant Attention*, 139 Psychol. Bull. 870 (2013) ("Many everyday behaviors require continuous attention for more than a few seconds . . . .  [E]xamples may differ greatly in duration and cognitive complexity, but they share the requirement for maintaining attention over time.").

Complaint—Case No. _____

continuously changing. SVOD firms therefore must continuously refresh their libraries with new and engaging options to keep subscribers paying. Some SVOD firms, like HBO Max and Paramount+, had the advantage of an existing catalog of movies and shows from which to draw without the need to negotiate licensing agreements. Others, like Netflix and Prime Video, had the advantage of an existing user base. Regardless, SVOD firms need enough subscribers to benefit from network effects: more subscribers meant the funds necessary to pay to license or create content, as well as enough data to properly develop prediction algorithms to target and recommend content for individual subscribers.

129.    As more SVOD firms enter the market and build out their libraries, content acquisition becomes more difficult. Some licenses are non-exclusive, allowing multiple SVOD firms to include the same content in competing libraries at the same time, but that is not standard.

130.    Second, **Research & Development**: Streamers also needed the necessary infrastructure to handle unlimited on-demand access to shows and movies over the internet. Subscribers encountering error messages, latency, or blurry programming were unlikely to stick around. Research and development is necessary to build a quality platform that can handle a growing user base, allowing thousands, perhaps millions, of users to access the platform simultaneously.

131.    The high costs required to build foundational streaming infrastructure act as a significant barrier to entry for new firms.

132.    Lastly, **Subscribers**. SVOD firms need a large, constantly-updating content library to stay afloat. That requires significant upfront investment costs, which, circularly, requires a lot of subscribers paying a lot of subscription fees. This creates a circle: more content means more users which means more money for content, ad infinitum. Netflix leadership has analogized this to a "flywheel." Per Netflix CFO Spencer Neumann: "The flywheel starts with engagement. It's engagement, revenue, profit, and it drives the flywheel."

133.    The "flywheel" cannot be replicated with capital investment. SVOD firms get more than just subscriber fees from subscriptions; they also get subscriber data. Consider Quibi, a nearly two-billion-dollar SVOD project with support from some of the biggest names in Hollywood. Quibi

spent millions on original content and advertising, including celebrity endorsements. Yet it failed

swiftly. Quibi, lacking subscriber data, didn't know what subscribers wanted. A post-mortem from

Variety, *Quibi is Officially Dead*, summarized what happened:[96]

> Katzenberg and Whitman had believed that Quibi offered a totally separate value
> proposition from the big SVOD services like Netflix — *Watch high-quality*
> *entertainment on the go!* — but consumers voted with their wallets. And it turns out
> that people mostly want to watch premium programming on their living-room TVs.

134.    Subscribers give SVOD firms needed funds and needed data. Even billions in

funding to produce original content cannot make up for user data. Thus, as a SVOD firm

accumulates larger and more loyal subscriber base, it raises barriers to entry for new firms.

Incumbent SVOD firms have funds to produce and license more content and data to predict what

users want to watch, giving them ever-increasing advantages over new entrants.

## IV.    ALLOWING NETFLIX AND WARNER BROTHERS-DISCOVERY TO MERGE WILL SUBSTANTIALLY LESSEN COMPETITION

### A.    Netflix's Already-Significant Market Share Will Balloon, Harming Innovation and Reducing Incentives To Compete

135.    Allowing the Merger to proceed would cause significant and substantial harm to

competition in the United States SVOD Market. The Merger would eliminate one of Netflix's closest

and most capable rivals; confer upon Netflix unprecedented control over premium scripted content,

blockbuster film franchises, and culturally significant intellectual property; and materially impair the

ability of existing and potential competitors to discipline Netflix's pricing, output, and innovation

decisions. These harms flow not from speculative concerns but from the structural realities of the

SVOD Market, the unique competitive relationship between Netflix and HBO Max, Netflix's historic

strategic approach to managing licensing rights for content that it owns, and the combined entity's

foreseeable post-merger incentives.

---

[96]    Todd    Spangler,    *Quibi    Is    Officially    Dead*,    Variety    (Dec.    1,    2020),
https://variety.com/2020/digital/news/quibi-officially-shuts-down-1234842926/    [https://perma.cc/
2F8H-XG27].

136.    As discussed above, Netflix already is the dominant SVOD provider in the United States, by far leading all competitors in subscribers, share of viewing time, brand power, global scale, original content investment, and data-driven personalization capabilities.  WBD, through HBO Max and its affiliated film and television studios, is one of a very small number of firms with the resources, talent relationships, and content portfolios necessary to constrain Netflix's behavior.  Competition between these firms plays a central role in the development of premium long-form scripted entertainment, the pricing of SVOD services, and the volume and diversity of new programming available to consumers.  Eliminating WBD and HBO Max as an independent rival would remove a vital competitive force and fundamentally alter the structure of the SVOD Market.

137.    The Merger, if consummated, will injure competition by eliminating a head-to-head rivalry in high-end content production and distribution.  Currently, Netflix and WBD, through HBO Max, compete directly for top creative talent, for production capacity, for audience attention, and for the development of prestige programming that anchors their services.  Post-Merger, Netflix would internalize the WBD Targets' creative and production pipelines, reducing the competitive pressure that currently compels Netflix to invest in bold, innovative, or risk-bearing projects.  The elimination of this rivalry is likely to reduce overall content output, diminish the diversity and quality of available content, and narrow the spectrum of creative voices appearing on major streaming platforms.

138.    At least three major Hollywood guilds—the Directors Guild of American (DGA), the Producers Guild of America (PGA), and the Writers Guild of America (WGA)—have raised concerns that consummation of the Merger will lead to a less competitive content creation environment that will impair the volume, diversity of thought, and quality of produced content while saddling consumers with increased costs.[97]  The PGA warned that reduced competition would result in "fewer opportunities for producers, creators, and other workers" and cause "fewer ideas [to] reach the public."[98]  The WGA raised similar concerns, observing that the Merger would "eliminate a direct

---

[97] Katie Campione, *Hollywood Guilds Raise Concerns with Senate Antitrust Subcommittee Over Warner Bros. Sale Amid Netflix Congressional Hearings*, Deadline (Feb. 3, 2026), https://deadline.com/2026/02/hollywood-guild-concerns-warner-bros-sale-senate-antitrust-1236708111/ [https://perma.cc/NV95-5JPS].

[98] *Id.*

Complaint—Case No. _____

competitor," "lead to significantly higher prices for consumers, and reduce the volume and diversity of content for all viewers."[99]

139.    Indeed, a previous merger of U.S. SVOD competitors—Hulu and Disney (operator of Disney+)—has led to substantial price increases across the U.S. SVOD market, with no new competitive entries to counter the Disney-Hulu merger.  Disney acquired a majority stake in Hulu in 2019 as part of its acquisition of Fox, and in the years since has increased operational control and begun to integrate Hulu into its existing streaming platform, centered around Disney+.  As a result, Hulu no longer operates as a distinct competitor, and Disney has in fact announced plans to phase out Hulu as a standalone SVOD product entirely, folding it within the Disney+ interface.  This consolidation of Hulu-Disney+ operation has coincided with price increases across the U.S. SVOD market, and no new competitive entry has occurred to replace the soon-to-be-phased out Hulu SVOD service.  The consolidation of Hulu with Disney+ represented an approximate 250-point increase in HHI—less than half the more-than-500-point HHI increase associated with the announced Netflix-WBD merger (as explained in more detail later in this section).  In the even more concentrated SVOD market extant now (as against the market that existed prior to the Hulu-Disney+ merger), a consolidation of even larger SVOD market leaders will near-certainly lead to even greater price increases and other competitive harms, borne by SVOD subscribers such as the Plaintiff.

140.    The Merger, if consummated, would further injure competition by giving Netflix the incentive and ability to increase prices or degrade service quality without fear of competitive discipline.  Netflix has demonstrated repeated willingness to raise subscription prices even while facing competition from full-scale rivals such as WBD through HBO Max.  With HBO Max removed as an independent competitor, Netflix would face less pressure to maintain affordable pricing or high-quality content.

---

[99] *Full Stream Ahead: Competition and Consumer Choice in Digital Streaming: Hearing Before the Committee on the Judiciary, Subcommittee on the Administrative State, Regulatory Reform, and Antitrust*, 119th Cong. (2026) (Prepared Statement for the Record of Writers Guild of America West and Writers Guild of America East), https://www.wga.org/uploadedfiles/news_and_events/ public_policy/wgaw-wgae_hearing_on_streaming_competition_1-2-25.pdf [https://perma.cc/E7ZN-WSFW].

141. The Merger, if consummated, will also weaken innovation incentives. Competition between Netflix and the WBD Targets has driven the development of new formats, high-budget serial dramas, boundary-pushing storytelling, and advanced recommendation technologies. Removing the WBD Targets from the competitive landscape will reduce experimentation and accelerate homogenization of content. Netflix's incentives to innovate diminish as its market position becomes more secure, creating a foreseeable reduction in both the quantity and creativity of new programming.

142. A post-Merger Netflix's network effects would further entrench competitive harm and strengthen the CARDS, making it even more difficult for existing rivals to expand and effectively impossible for new entrants to emerge. As explained above, the CARDS reflects the mutually reinforcing relationship between (a) control over high-value premium content; (b) high quality technological infrastructure; and (c) the scale of a platform's subscriber base. Content attracts subscribers, and subscribers fund further content and infrastructure investment and drive data-fueled recommendation and content surfacing systems; this feedback loop gives incumbents entrenched advantages that new entrants cannot replicate. The proposed acquisition strengthens the CARDS and deepens this structural moat by uniting the two firms whose content portfolios and subscriber networks play the most significant roles in driving SVOD engagement and subscription decisions in the United States.

143. First, the merger concentrates under a single firm an unparalleled library of must-have premium content that competitors cannot duplicate. Netflix already commands one of the largest original-content pipelines in the world. The WBD Targets own a globally recognized set of franchises—including *Harry Potter*, DC Comics, *Game of Thrones*, *The Sopranos*, *Succession*, *The Last of Us*, Looney Tunes, and Warner Bros.' extensive film archives—that serve as anchor properties for SVOD consumption. The combination of Netflix's broad slate of originals with the WBD Targets' marquee franchises creates the largest and most comprehensive premium content library in the market. Because content is the primary mechanism through which subscribers choose and retain streaming services, this consolidation significantly enhances Netflix's ability to attract and keep subscribers and makes it far harder for rivals to meaningfully differentiate themselves. No entrant

could assemble a comparable library, and no existing SVOD competitor could replicate this breadth of exclusive content, regardless of investment.

144.    Second, by augmenting Netflix's already enormous subscriber base with the WBD Targets' substantial and devoted HBO Max subscriber population, the merger reinforces the other side of the CARDS.  Post-merger, the combined entity will possess a subscriber footprint far larger than any competing SVOD service, enabling it to amortize production costs over a broader base, reduce per-subscriber costs, and invest more heavily in future content creation.  This scale advantage directly heightens the CARDS: the more subscribers Netflix controls, the more efficiently it can produce and acquire content, and the more content it can deploy to attract additional subscribers, further widening the gap between itself and rivals.  Smaller competitors—already struggling to reach minimum viable scale—will fall further behind in their ability to fund prestige programming or compete on depth of library.

145.    Third, the merger enhances the feedback loop that makes the CARDS so formidable. With control over the WBD Targets' premier content, Netflix would be able to lock in subscribers with a broader and more compelling slate of exclusive programming, increasing switching costs and reducing churn.  A subscriber who relies on Netflix not only for Netflix originals but also for HBO Max's award-winning series and the WBD Targets' blockbuster franchises is substantially less likely to cancel the service or experiment with alternatives.  This expanded lock-in effect further suppresses the ability of rivals to lure subscribers away, even with aggressive promotional pricing or niche content offerings.   Because SVOD consumers typically maintain only a limited number of subscriptions, every incremental increase in Netflix's retention weakens competitors' ability to grow, thereby compounding the competitive harm.

146.    Fourth, the merger strengthens the CARDS by depriving competitors of the WBD Target content they previously relied upon.  WBD has historically licensed significant portions of its library to third parties, enabling competitors like Amazon, Hulu, and Peacock to diversify their offerings and compete more effectively.  Following the merger, Netflix will have both the incentive and the ability to withhold or restrict access to this content, forcing rivals to compete without essential

41

programming and further raising their acquisition costs. This foreclosure of third-party licensing opportunities is itself a multiplier on the CARDS: when rivals lose access to valuable content, their ability to attract subscribers diminishes, and Netflix's relative advantage automatically increases. The following subsection expands on this anti-competitive facet of the Merger.

147. Finally, the merger strengthens the CARDS in a way that is self-reinforcing and irreversible in competitive timescales. New entrants would face the impossible task of matching a vertically integrated content-and-subscriber ecosystem that has been assembled over decades and amplified through this consolidation. Entrants cannot purchase or recreate historic franchises; they cannot quickly build a subscriber base in the tens of millions; and they cannot match the economies of scale or data advantages that accrue when one firm controls both the largest subscriber footprint and the richest content library in the market. The strengthened CARDS therefore becomes a structural barrier that freezes the competitive landscape in place and ensures that the post-Merger entity remains dominant for the foreseeable future.

148. These harms are not speculative or remote. Industry analysts, economists, and the public statements from Netflix and WBD indicate that Netflix expects the merger to increase subscriber counts, boost engagement, and generate significant cost efficiencies—results consistent with a reduction in competitive pressure. The merger poses a direct and immediate threat to the competitive process in the American SVOD market, altering incentives, raising rivals' costs, and expanding the merged firm's ability to exercise market power.

149. Indeed, under the 2023 United States Department of Justice and Federal Trade Commission Merger Guidelines, the Merger is presumptively anticompetitive.[100] The Merger Guidelines include thresholds keyed off of the Herfindahl-Hirschman Index ("HHI"), a metric that measures market concentration and is calculated by summing the squares of the market shares of competitor firms. The Merger Guidelines state that a "merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed

---

[100] *Merger Guidelines* (the "Merger Guidelines"), U.S. Dep't of J. & Fed. Trade Comm'n (Dec. 18, 2023), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf [https://perma.cc/3QJ7-ZWPG].

to substantially lessen competition or tend to create a monopoly."[101]  A market with HHI greater than 1,800 is considered "highly concentrated" under the Merger Guidelines.  The Merger Guidelines also state that "a merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points."[102]

150.    According to JustWatch, a service that provides users guidance on what content is available on which SVOD and, through doing so, gathers information on SVOD usage, the market share of SVOD services in the United States are as follows:[103]

## U.S. SVOD Market Shares (Jan–Sep 2025)

Based on SVOD engagement on JustWatch, here is the current U.S. platform landscape:

| Platform | SVOD Market Share (Q1 - Q3 2025) |
| --- | --- |
| Prime Video | 21% |
| Netflix | 20% |
| Disney+ | 13% |
| HBO Max | 13% |
| Hulu | 11% |
| AppleTV+ | 8% |
| Paramount+ | 7% |
| Peacock Premium | 2% |
| Starz | 1% |
| Others | 4% |

---

[101] *Id.* (footnotes omitted).
[102] *Id.* (footnote omitted).
[103] *U.S. Streaming Market Report – Acquisition Scenarios for Warner Bros. Discovery*, JustWatch, https://www.justwatch.com/us/press/netflix-paramount-warner-bros?utm.   [https://perma.cc/6HCZ-6QQV] (last visited Feb. 13, 2026).

Complaint—Case No. _____

151.   Further, both Disney+ and Hulu are now commonly owned, and are in the process of being consolidated into a single, Disney+-branded interface.  Accordingly, the below analysis treats Disney+ and Hulu as having a market share of 24%.

152.   Based on the JustWatch data, the combined Netflix-WBD entity would hold an estimated 33 percent share of the United States market, which would create a highly concentrated market based on the Merger Guidelines' 30% threshold for that designation.

153.   Based on the JustWatch data, the premerger HHI is 1,720 and the post-merger HHI would be 2,240.  Accordingly, the merger would both cause a concentrated market to become "highly concentrated" and would be associated with an HHI delta of 520.  The proposed Merger is presumptively anticompetitive under the DOJ Merger Guidelines, as it would both create a highly concentrated market with a 100-point increase as well involve a 100-point increase that results in a firm with over 30% market share.

154.   Netflix and WBD are certainly aware of the widespread criticism over the anticompetitive effects of the proposed Merger and could have taken steps to help mitigate that criticism, but they have declined to do so.  For instance, the Merger Agreement places no restrictions on Netflix's ability to reorganize, consolidate, or restructure WBD's operations after closing.  By permitting Netflix to merge subsidiaries, collapse divisions, or reallocate assets without restriction, the agreement effectively authorizes Netflix to dismantle or downsize WBD's independent production and distribution units.  This creates a substantial risk that Netflix could eliminate overlapping programming pipelines, slow or discontinue development of competing original content, or redirect WBD's creative resources exclusively toward Netflix's strategic objectives.  While such consolidation may be permissible as a matter of contract, its competitive implications are significant: it may result in lower overall content output, reduced diversity of programming, fewer independent creative voices, and diminished innovation in premium scripted entertainment.  Consumers ultimately bear the cost (and will see a reduction in choice) if a major content originator is absorbed into the ecosystem of its largest competitor and loses its ability—or incentive—to act independently.

Complaint—Case No. _____

155.    Furthermore, the Merger Agreement is entirely silent on public-interest safeguards, such as commitments to preserve content diversity, protect independent production, maintain output levels, or ensure continued availability of culturally significant programming.  It contains no open-access commitments, no obligations to maintain separate development pipelines, and no provisions requiring continued distribution of HBO or WBD content beyond Netflix's own walls.  By omitting any consumer-facing assurances or structural limitations, the agreement leaves Netflix free to exercise its expanded market power in ways that may lessen competition, reduce quality, increase prices, and narrow the range of content available to viewers.  The lack of any affirmative consumer protections underscores the risk that the merger will result in exactly the type of competitive harm—reduced output, restricted choice, and diminished innovation—that Section 7 of the Clayton Act is designed to prevent.

**B.    Netflix's Control Over WBD'S Library Will Give It the Power To Withhold Inputs from Competitors**

156.    Merging WBD's vast back catalog of content—one of "the deepest film & TV libraries in the world" in Netflix's words—into the Netflix corporate structure will hand Netflix an on/off switch for the viability of its SVOD competitors.[104]  That is anathema to maintaining a competitive SVOD Market.

157.    WBD's content library has emerged as a uniquely valuable resource for SVOD firms.  WBD's willingness to license that content library for third party use on competitor SVOD platforms—WBD's HBO Max is an SVOD competitor firm—provides a key tool for SVOD firms seeking to maintain or establish a competitive edge.

158.    WBD's public statements verify and explain its expansive view towards third party licensing.  Before Jason Kilar's 2022 departure as WBD CEO, WBD "withheld as much content as possible for HBO Max to rapidly grow its subscriber base."[105]  As consequence, WBD had "a ton

---

[104]    Netflix,    SEC    Form    425,    https://www.sec.gov/Archives/edgar/data/1065280/ 000119312525310099/d81407d425.htm [https://perma.cc/3AK6-YAQN].

[105] Alex Weprin, *David Zaslav's Strategy Shift: Licensing Out Warners' IP Treasure*, The Hollywood Reporter    (Sept.    16,    2022),    https://www.hollywoodreporter.com/business/business-news/david-

of content that has been sitting idly for just purely principle reasons," as stated by WBD CFO Gunnar Wiedenfels in September 2022. Things changed under the leadership of WBD's current CEO David Zaslav, who in 2022 declared WBD "open for business" when it came to third party licensing.[106]

159. Since 2022, WBD has regularly licensed its back catalog to a host of SVOD competitor firms including Netflix, The Roku Channel, Amazon Freevee, Tubi, and others.[107] Licensing came to represent a more significant revenue source for WBD than it had previously. For instance, WBD's third quarter 2023 content licensing revenue was $410 million, more than triple the reported licensing revenue reported for the same quarter the previous year."[108]

160. WBD's post-2022 approach of "happily sell[ing]" its content catalog "to the highest bidder" contrasts starkly with rival SVOD competitors "that have increasingly kept their content for themselves and their streaming services."[109]

161. Disney CEO Bob Iger described Disney's guarded third-party licensing practices as justified by its earlier experiences with Netflix, to which Disney had licensed content until "it became pretty clear that we had been selling nuclear weapons technology to a developing country, and they were now using it against us."[110]

162. Netflix has traditionally decline to license content that it owns to other streaming services. In December 2023, Co-CEO Sarandos explained that Netflix did not think "other outlets would have a better chance finding more viewing for the programming that we have on Netflix,

zaslavs-strategy-shift-licensing-out-warners-ip-treasure-1235222408    [https://perma.cc/GZ4B-PRE2].
[106] *Id.*
[107] Erik Gruenwedel, *Warner Bros. Discovery Licenses DC Studios Superhero Movies, TV Shows to Tubi*, Media Play News (Dec. 12, 2023), https://www.mediaplaynews.com/warner-bros-discovery-licenses-dc-studios-superhero-movies-tv-shows-to-tubi  [https://perma.cc/59WK-UKGW].
[108] Eileen Connelly, *Leap in Content Licensing Revenue Helps Narrow WBD's Streaming Loss*, TheWrap (Aug. 3, 2023), https://www.thewrap.com/warner-bros-discovery-hbo-content-licensing-revenue/ [https://perma.cc/9PTV-UECE].
[109] Caitlin Huston & Georg Szalai, *David Zaslav's Hollywood Doctrine: "Make Sure We Get Paid"*, Hollywood Reporter (Aug. 10, 2022), https://www.hollywoodreporter.com/business/business-news/david-zaslavs-hollywood-doctrine-make-sure-we-get-paid-1235195846/ [https://perma.cc/9R59-PCML].
[110] Weprin, *supra* note 1055.

46

which is why we don't do it."[111]  Licensing Netflix content to SVOP competitors "is not part of our business plan."[112]

163.    The WBD Targets and, to a lesser extent, some other firms that are both SVOD market participants and content creators, have moved away from a "walled garden" approach to in-house content by licensing their intellectual property for distribution on rival streaming services like Netflix.  But "[o]ne holdout from the practice of licensing original content is Netflix itself."[113]  Co-CEO Sarandos observed "I do think that we can add tremendous value when we license content [from other content producers]" but "I'm not positive that that's reciprocal."[114]

164.    Netflix applies a similar ethos to licensing deals its strikes as licensor by striking deals to act as the exclusive streaming distributor for other content producers.[115]  The role is different, but the philosophy is the same: siloing content as exclusively available on the Netflix platform deprives other SVOD competitors of that content, harming Netflix competitors and benefitting Netflix.

165.    WBD "has one of the world's deepest libraries of IP, of films and TV shows" in the words of Netflix Co-CEO Peters.[116]  One of its subsidiaries, WB Television Group (WBTV) has traditionally produced new original content for distribution on third-party platforms.  WBTV executes this based on its extensive network of contracts and relationships with television writers,

---

[111] Brian Welk, *Why Netflix Doesn't License Its Own Content to Others*, IndieWire (Dec. 13, 2023), https://www.indiewire.com/news/business/why-netflix-doesnt-license-own-content-out-1234934844/ [https://perma.cc/Y437-XGLJ].

[112] *Id.*

[113] Ryan Faughnder, "*Suits" Showed the Power of Licensing.  Is Hollywood's "Walled Garden" Strategy Losing Favor?*, L.A. Times (Dec. 19, 2023), https://www.latimes.com/entertainment-arts/business/newsletter/2023-12-19/six-feet-under-on-netflix-how-the-streaming-business-learned-to-love-licensing-again-the-wide-shot [https://perma.cc/PUS4-7GHV].

[114] *Id.*

[115] *Netflix and Sony Pictures Entertainment Enter New Pay-1 Deal with First-of-Its-Kind Global Reach*, Netflix (Jan. 15, 2026), https://about.netflix.com/en/news/netflix-and-sony-pictures-entertainment-enter-new-global-pay-1-deal [https://perma.cc/ERS2-5R8R] (announcing "exclusive multi-year agreement" to stream Sony Picture Entertainment's feature films following their "full theatrical and home entertainment windows").

[116] Arvind Hickman, *Netflix's Acquisition of Warner Bros. Faces Backlash & Potential Antitrust Challenge*, B&T (Dec. 8, 2025), https://www.bandt.com.au/netflixs-acquisition-of-warner-bros-faces-backlash-potential-anti-trust-challenge/ [https://perma.cc/P2H3-XMU4].

Complaint—Case No. _____

creators, and producers.  WBTV also has rights to make new content that is derivative of certain assets in WBD's deep library of IP and content.  WBTV's content is among the most watched of any television production studio.  And, critically, WBD has been "open for business" when it comes to licensing its content for streaming on competitor SVOD firms.

166.   WBD licensing is an essential input for SVOD firms seeking to remain competitive with Netflix, the dominant SVOD firm.

167.   As detailed supra at Section I.C, Netflix has, historically, been inhospitable to licensing any of its content or IP assets to SVOD competitors.  Post-Merger, it would have the ability to turn off the WBD licensing spigot and depriving SVOD competitors of an essential input needed to compete.

168.   Netflix has taken no measures that would prevent it from doing with WBD content what it has historically done with its own: refuse to license it to enhance its own competitive position and harm its SVOD rival's capacity to compete in the marketplace.  For example, the Merger Agreement is devoid of any provisions requiring Netflix to maintain WBD's historic licensing practices or to continue making WBD's content available to competing distributors.  Once the Merger closes, Netflix—which will become the owner of the WBD Targets and their entire content library— would have the unilateral power to restrict access to that content in future licensing agreements, thus reducing consumer choice.

169.   The Merger Agreement contains no commitment to preserve the WBD Targets' existing third-party licensing arrangements, no obligation to offer content on fair, reasonable, and non-discriminatory terms, and no mechanism ensuring that rival SVOD platforms or linear networks will continue to have access to critical programming previously supplied by WBD.  The absence of any such protections will likely result in a lessening of competition in the SVOD Market because WBD has long been a key supplier of high-value, premium content that other distributors rely on to attract viewers.  Without contractual limits, Netflix is free to foreclose rivals or raise their costs by withholding or repricing WBD's signature franchises, thereby reducing consumer choice and weakening competitive pressure across the SVOD market.

Complaint—Case No. _____

170.     If Netflix acts in a manner consistent with its own historic strategic practices and with post-Merger economic incentives to withhold WBD content from SVOD rival firms, it will harm competition.  The result of such action will be to raise competitors' costs (and pass those costs down to consumers, including Plaintiffs), impair rivals' ability to attract and retain subscribers, and ultimately reduce consumer choice

## V.     ANTITRUST STANDING

171.     Clayton Act Section 16, 15 U.S.C. § 26 empowers "[a]ny person" to "sue for and have injunctive relief" against "threatened loss or damage by a violation of the antitrust laws."  The threatened loss or damage must be "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful" to grant a private party standing to seek an anti-merger injunction.  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  "The general rule is that customers and competitors in the affected market have antitrust standing."  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020).

172.     Plaintiffs are current Netflix subscribers across a variety of different subscription plans.  If the Merger closes, they face probable harms in the form of increased pricing and degraded quality of product.  In other words, Plaintiffs are customers in the SVOD Market who reasonably anticipate injury brought about by decreased competition in the market resulting from the Merger. That suffices to establish their standing to seek an anti-merger injunction.

173.     There are several different types of harms Plaintiffs reasonably anticipate will flow from a completed merger.  In summary they are (1) increased pricing on some or all Netflix subscription plans following the reduction in number and quality of Netflix competitors following a merger transaction; (2) degradation of quality of the service for some or all Netflix subscription plans in the form of more ads, more restrictive user limitations, or other anti-consumer service changes; and (3) new original content that is fewer in number, more narrow in viewpoint and less differentiated from the offerings of competitors, more derivative of existing content including existing content owned by the post-merger entity, and otherwise lower in quality.

Complaint—Case No. _____

174.    All of these harms are direct and personal to the Plaintiffs that seek to challenge the Merger.

175.    Post-merger pricing increases will cause Plaintiffs to suffer a monthly, out-of-pocket economic loss by paying more money for their streaming service, which they will be more likely to absorb because of the diminished viability of competitor services.

176.    Post-Merger degradation of quality of services will cause Plaintiffs to suffer personal harms in the form of lost time spent viewing additional advertising materials and out-of-pocket economic losses by potentially paying more money for additional subscriptions in the wake of more restrictive user limitations.

177.    Post-merger degradation of quality in the form of poorer quality original content will harm Plaintiffs in the form of depriving them of a broader scope of viewpoints, novel ideas, and new artistic experiences.

178.    The losses and damages to the Plaintiffs threatened by the Netflix/WBD merger are of a type the antitrust laws were intended to forestall (i.e., damages resulting from reduced competition), directly felt by the Plaintiffs, and are reasonably anticipated in light of the facts set forth herein.  That is enough to establish antitrust standing for the Plaintiffs. *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999).[117]

### VIOLATION OF THE CLAYTON ACT
### (15 U.S.C. §§ 18 and 26)

179.    Plaintiffs bring their claims under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18 and 26.

180.    The effect of the Merger may be to substantially lessen competition, or to tend to create a monopoly, in interstate commerce in the relevant market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

181.    Unless enjoined, the Merger may, and most probably could have the following potential effects in the relevant markets:

---

[117] The two other antitrust factors articulated by *American Ad Management*—the risk of duplicative recovery and the complexity of apportioning damages—do not apply to this injunction-only complaint.

Complaint—Case No. _____

a.  Actual and potential competition between Netflix and certain WBD Targets, namely HBO Max, may be eliminated;

b.  Competition in general among SVOD firms in the relevant market may be lessened substantially;

c.  Subscription pricing for Netflix may become higher than they otherwise could be;

d.  Subscription quality for Netflix may be degraded—by making account usage more restrictive or airing more ads for ad-featuring subscriber accounts or by other means—to a quality lower than they otherwise would be;

e.  New content produced by Netflix or the WBD Targets may be degraded—in the form of less new content being produced, new content reflecting a narrower scope of viewpoints, new content failing to engage with novel ideas or artistic experiences, new content that is more often derivative of existing ideas or art works, or otherwise—to a quality lower than they otherwise would be; and

f.  Consumer choice may be lessened.

182.    Unless enjoined, the Merger may, and most probably could, result in the post-merger entity controlling a market share that is sufficiently concentrated as to raise a presumption of illegality.

183.    By reason of this violation, Plaintiffs are threatened with loss or damage in the form of potentially higher subscription prices, lower subscription quality, or lower quality new content made available via their subscriptions; the potential elimination of competitor SVOD alternatives to Netflix, as well as irreparable harm for which damages will be inadequate to compensate Plaintiffs. Plaintiffs are accordingly entitled to bring suit under Section 16 of the Clayton Action, 15 U.S.C. § 26, to obtain permanent injunctive relief against the proposed Merger, and to recover their costs of suit including reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request the Court to enter judgment in Plaintiffs' favor and against Netflix for:

    a.   an injunction under the Clayton Act § 16, 15 U.S.C. § 26, restraining Netflix from purchasing, acquiring, or merging with the WBD Targets in violation of the Clayton Act § 7, 15 U.S.C. § 18;

    b.   reasonable attorney's fees and costs pursuant to Clayton Act § 16, 15 U.S.C. § 26; and

    c.   any other relief the Court may deem just and proper.

Dated: February 17, 2026          Respectfully submitted,

PAK HEINZ PLLC

By: /s/ Albert Pak
     Albert Pak
     Noah Heinz (*pro hac vice forthcoming*)

*Attorneys for Plaintiffs*